BLACKSHARE *v.* STATE.

Opinion delivered April 18, 1910.

1. RECEIVING STOLEN GOODS—SUFFICIENCY OF VERDICT.—Where an indictment contained two counts, the first for larceny and the second for receiving stolen goods, a verdict finding "the defendant guilty of receiving stolen property," without using the term "feloniously," and fixing his punishment at a term in the penitentiary, is a general verdict, and, when considered in the light of the evidence and the court's charge, may be sufficient to sustain a conviction under the second count. (Page 550.)

2. LARCENY—ANIMALS OF ANOTHER.—One who takes and converts the animals of another to his use is guilty of larceny if at the time of the taking he had the felonious intent to deprive the true owner, whether known or not, of the permanent use and benefit of his property. (Page 553.)

3. SAME—ANOTHER'S ANIMAL—EFFORT TO COMPLY WITH STRAY LAWS.— One charged with larceny of another's animals may set up in defense that he endeavored. to comply with the estray laws, and the testimony adduced to establish such defense may be considered by the jury in determining whether the accused took the animals with a felonious intent to convert them and deprive the owner of his property. (Page 554.)

4. SAME—ESTRAYED ANIMALS.—The rule applicable in case of lost goods that if the finder neither knows nor has any immediate means of ascertaining the owner, and appropriates them to his own use, he is not guilty of larceny, whatever may be his intent at the time, is inapplicable to estrayed domestic animals, which are not lost in the proper sense of the term. (Page 555.)

5. CRIMINAL LAW—IMPROPER ARGUMENT.—It was not error, in a prosecution for larceny and receiving stolen property, to permit the prosecuting attorney in his closing argument to say: "Why are all these people here? They came here to see if the law can be enforced; and I want to know, and they want to know, if property can be stolen, and no explanation be offered, and a man go scot free." (Page 558.)

Appeal from Clay Circuit Court, Eastern District; *Frank Smith,* Judge; affirmed.

*L. Hunter* and *Spence & Dudley,* for appellant.

The property must have been stolen before defendant can be convicted of receiving stolen property. 8 So. 529; 32 Gratt. 946; 34 Am. R. 799; 106 Ind. 272. Defendant must have known it to have been stolen. 118 N. W. 1042; 94 Pac. 218; 105 Minn. 217; 61 S. W. 1072. A verdict finding defendant guilty of receiving stolen property is insufficient to support a judgment or

sentence. 44 So. 940; 54 Fla. 96; 43 So. 311; 55 Ga. 191; 38 La. Ann. 357; 67 Pac. 42; 135 Cal. 61. It is necessary to show that the intent to steal existed at the time of the taking. 103 Ala. 40; 16 So. 12; 15 Ala. 158; 14 So. 859; 15 Ark. 168; 46 Ia. 116; 96 Ky. 85; 27 So. 852; 49 Am. St. R. 287; 3 Cush. 235; 39 N. Y. 459; 64 N. C. 586; 55 S. W. 334; 20 Tex. App. 662; 21 *Id.* 579; 2 S. W. 808; 2 S. W. 888. A stray horse which has been such for years is not the subject of larceny. 36 Tex. 375; 38 Tex. 643; 12 Cox, Cr. Cas. 489; 43 Tex. 650; 63 Ind. 285; 30 Am. St. R. 214; 7 Tex. App. 470. In his remarks to the jury the prosecuting attorney should not be permitted to go outside the record. 44 Wis. 282; 48 Ark. 106; 74 Ark. 258. The party from whom appellant purchased these cattle was guilty, not of larceny, but of violating the estray laws only. Kirby's Digest, § 7869. ·

*Hal L. Norwood,* Attorney General, and *W. H. Rector,* Assistant, for appellee.

Taking a horse found estray upon the taker's land, for the purpose of securing a reward from the owner thereof, is larceny. 105 Mass. 163. It is larceny for one to take up an estray, intending at the time to convert it to his own use. 3 Park. C. C. 129; 63 Ind. 285; 85 Ind. 503; 53 Mo. 124; 28 Mo. 528. Cases are not reversed because counsel express an opinion about matters connected with the trial. 74 Ark. 256; *Id.* 491; 72 Ark. 613; 73 Ark. 458.

WOOD, J. The grand jury of the Eastern District of Clay County, at its January term, 1910, indicted the appellant, Lin Blackshare, for larceny and knowingly receiving stolen property, with the intent to deprive the true owner of his property, which indictment, omitting the formal parts, is as follows:

## "Count 1.

"The grand jury, in and for the district, county and State aforesaid, under and by the authority of the State of Arkansas, accuse the person named in the caption hereof as defendant of the crime of larceny, committed as follows, towit:　　On the tenth day of June, 1909, in the district, county and State aforesaid, the person named in the .caption hereof did unlawfully and feloniously take, steal and drive away two head of cattle of the value of _____ dollars, of the value of _____ dollars, and of the value of _____ dollars, the property of A. W. Zoll, against the peace and dignity of the State of Arkansas.

"Count 2.

"The grand jury, in and for the district, county and State aforesaid, under and by the authority of the State of Arkansas, accuse the person named in the caption hereof as defendant, of the crime of receiving stolen property, committed as follows, towit: On the tenth day of June, 1909, said person named in the caption hereof did unlawfully, feloniously and knowingly receive into and have in his possession, with intent to deprive the true owner of his property, two head of cattle of the value of one hundred dollars, of the value of _____ dollars, of the value of _____ dollars, and of the value of _____ dollars, the property of A. W. Zoll, all of which property had at the said time been stolen, and the said person named in the caption hereof, at the time of receiving and taking said personal property in his said possession, well knew that the same had been stolen; against the peace and dignity of the State of Arkansas."

The appellant was convicted upon the second count of the indictment which correctly charged him with the crime of receiving stolen property, knowing that the same had been stolen. The jury returned the following verdict: "We, the jury, find the defendant guilty of receiving stolen property, and fix his punishment at one year in the penitentiary."

First. It is contended by appellant that this verdict is insufficient to constitute a verdict of conviction for knowingly receiving stolen property because the verdict does not contain a finding that it was done knowingly. The following authorities support the contention that a verdict simply finding defendant guilty of receiving stolen property is not sufficient: *State* v. *Whitaker,* 89 N. C. 472; *O'Connell* v. *State,* 55 Ga. 191; *Dreyer* v. *State,* 11 Texas App. 631; *State* v. *Burdon,* 38 La. Ann. 357; *Miller* v. *People,* 25 Hun (N. Y.) 473; *O'Neal* v. *State,* 44 So. 940; *Harris* v. *State,* 43 So. 311; *People* v. *Tilley,* 67 Pac. 42, 135 Cal. 61. In all of the above cases except the one in 11 Tex. App. the verdict of the jury did not assess the punishment at imprisonment in the State penitentiary. In the case from New York (*Miller* v. *People*) the form of the verdict was: "We find the person guilty of receiving stolen goods, knowing them to be stolen." The charge was that the prisoner "feloniously" received, etc. The court held that the verdict was in form a special ver-

dict, and was fatally defective in omitting the word "feloniously" which former decisions of that court had held to be essential. The form of the verdict in the case at bar is distinguished from the form of the verdict in all of the above cases except the Texas case in that the jury prescribe the punishment, showing expressly an intention to find the accused guilty of an offense punishable by imprisonment in the penitentiary. The verdict under consideration is not a special verdict.

"A special verdict is one which sets out the facts, leaving the court to draw therefrom the conclusion of law." Bish. Crim. Proc. § 1006. A general verdict "is a conviction of everything well charged in the indictment." 1 Bish. Crim. Proc. § 1006a. "A partial verdict is one of conviction as to a part of the charge, and acquittal or silence as to the residue." 1 Bish. Crim. Proc. § 1009.

The verdict in this case is a *partial* verdict upon the second count of the indictment and in the form of a general verdict on that count.

Mr. Bishop says: "The test is, that if the verdict sufficiently finds anything, whether for or against the defendant, judgment will be rendered on the one side or the other for what is thus found." * * * "The language of the verdict, being that of 'lay people,' need not follow the strict rules of pleading, or be otherwise technical. Whatever conveys the idea to the common understanding will suffice, and all fair intendments will be made to support it." I Bish. Crim. Proc. § § 1004, sub. 5; 1005a.

In *O'Neal* v. *State,* 44 So. 940, *supra,* the form of the verdict was: "We, the jury, find the defendant (naming him) guilty of receiving stolen goods." The Supreme Court of Florida while holding the verdict to be a nullity in that case, announced a rule of construction which we approve, towit: "In a criminal case the verdict should be construed with reference to the indictment or information and the entire record, and if, when so construed, it is definite and clearly expresses the manifest intention of the jury, and is otherwise legal, mere inaccuracies of expression will not render the verdict void."

This court has heretofore adopted that rule of construction for verdicts. In *Strawn* v. *State,* 14 Ark. 549, the appellant was indicted for maiming Jesse Edwards, the offense being a felony

under the statute. The same statute provided: "that if persons fight by mutual agreement, and one of them is maimed, it shall not be deemed maiming within the meaning of this act; but the parties shall be punished by fine and imprisonment as for an aggravated affray," etc. The latter offense was a misdemeanor, but embraced in the same indictment with the felony. The verdict was: "We, the jury, do find the within-named John Strawn not guilty as charged in the within indictment, but find that he and the within-named Jesse Edwards fought by mutual agreement." The prisoner moved in arrest of judgment, because the verdict, which acquitted him of the offense charged in the indictment, failed to show that he was guilty of any minor offense. Passing on the motion, this court, through Chief Justice WATKINS, said: "Certainly, it might have been proper for the verdict to have stated more explicitly that the accused was not guilty, as charged, of the offense of maiming, but that he and Edwards fought by mutual agreement, whereby the latter was maimed. But, looking at the indictment, the statute and the verdict as returned, the conclusion is reasonable, if not unavoidable, that such was the meaning and intention of the jury; and although the verdict does not state, in express terms, that Edwards was maimed, it will bear that construction, and was therefore sufficient to warrant the sentence."

In *Fagg* v. *State*, 50 Ark. 506, the appellant was indicted for murder in the first degree. The jury returned the following verdict: "We, the jury, find the defendant guilty of manslaughter, but can not agree upon' the punishment." The court sentenced him as for voluntary manslaughter. This was assigned as error. Chief Justice COCKRILL, for the court, said: "The verdict did not designate the degree of manslaughter, nor assess the punishment. The duty of fixing the penalty therefore devolved upon the court. On conviction of murder the statute requires the degree of the offense to be found by the jury. It is not so as to manslaughter; it is only necessary that the court should have a certain guide to the intention of the jury. Verdicts receive a reasonable construction in order to reach the jury's meaning, and, when that is found, they are enforced as though the intention was express. Viewing the verdict in this case in the light of the evidence and the court's charge, the conclu-

sion is reasonable, if not irresistible, that the jury intended a conviction of voluntary manslaughter. The court had charged them specifically upon that offense, and had made no mention of involuntary manslaughter. If they knew that there was such a grade of homicide, it is not probable that they understood that the defendant could be convicted of it in this prosecution. A verdict of involuntary manslaughter would have been inappropriate to the evidence, and the jury would have been unmindful of their duty to have returned such a verdict. In the absence of an expression to the contrary, a presumption of an intention to violate a duty is not indulged against a juror more than any other officer. The evidence certainly warranted a verdict of murder in the first degree; that the jury did not intend to acquit is shown by the verdict."

Applying the above doctrine of our own cases to the verdict in the present case, it is sufficient to sustain the judgment of conviction for receiving stolen property knowing same to have been stolen. The fact that the jury prescribed the punishment at two years in the penitentiary showed that they intended to convict of some offense charged in the indictment. They designated it as "receiving stolen property," showing that they did not intend to convict of larceny as charged in the first count. The only other count charged the offense of receiving stolen property knowing same to have been stolen." The words used in the verdict, when taken in connection with the second count of the indictment and the evidence, the charge of the court pertaining to that, leave no room to doubt that the intention of the jury was to find him guilty on that count. Under the charge of the court the jury could not have found the defendant guilty on that count without finding that he received the property knowing same to have been stolen. The language of the verdict was tantamount to a general verdict of guilty on that count, and, according to the rules for the construction of verdicts, it met every requirement of the law, and furnished a certain and correct basis for the judgment of the court.

Second. Without going into detail, it suffices to say that the evidence tended to prove and warranted the jury in finding that one George Johnson took up the cattle in controversy that estrayed from their owner and were running around his place.

They were known in the neighborhood as stray cattle. When approached by the owner for the cattle, Johnson claimed that he had turned them out with his cattle, but did not know what had become of them. It was shown that Johnson disposed of the cattle under circumstances which tended to prove, and which warranted the jury in finding, a felonious intent on his part to convert the same to his own use. There was testimony to the effect that it was generally understood that the cattle were posted. But there was no evidence in the record on the part of appellant tending to prove that George Johnson had complied with the estray laws. There was no testimony showing that he attempted to comply with the estray laws or showing what efforts, if any, he had made in that direction.

Appellant asked the court to grant the following prayer:

"You are instructed that, if you find from the evidence that George Johnson took up the steers as estrays and made an effort to post them, and later converted them to his own use, he would not be guilty of larceny, and hence the defendant, Lin Blackshare, would not be guilty."

The court refused, and appellant duly preserved his exceptions. The court gave the following prayers:

"No. 7. Evidence has been offered in regard to the posting of the steers as estrays. You will consider this evidence, as you will all other evidence in the case, as bearing upon the question of the defendant's intent. It is for you to consider the evidence upon that question and decide the weight, if any, it shall have in determining whether or not the defendant is guilty of either the larceny of these steers or of the offense of knowingly receiving them into his possession, knowing them to have been stolen.

"No. 8. If you believe from the evidence that George Johnson took up the steers as estrays, and attempted to post them, and that the defendant in good faith believed that they had been poste' in such way as to vest in Johnson the title, and that the said Johnson had the right to sell them, and defendant bought them in good faith, then you will find the defendant not guilty."

The instructions given by the court concerning estrays was as favorable to appellant as the evidence warranted. The court

did not err in refusing the prayer of appellant. An effort on the part of one who takes up cattle as estrays to post them would not justify such one in converting such cattle to his own use. The law requires one taking up estrays to do something more than simply to make an effort to post them. See chapter 149, Kirby's Digest. An effort, but failure, to comply with the estray laws before converting estrayed animals to one's own use would be evidence to be considered by the jury as tending to prove the absence of a felonious intent in making such conversion. But that is as far as it could go. Where one has taken and converted the animals of another to his own use, if at the time of the taking there was the felonious intent to deprive the true owner, whoever he might be, of the permanent use and benefit of his property, the one so taking the animals of another under our statute would be guilty of larceny. One so charged may set up in defense an effort to comply with the estray laws, and the testimony adduced to establish such defense may be considered by the jury in determining the question as to whether the accused took the animals with a felonious intent at the time of the taking to convert them to his own use and to permanently deprive the owner of his property.

"When an estray is taken up by one who has at the time of the taking the felonious intent to convert same to his own use, it is larceny." *Starck* v. *State,* 63 Ind. 285. See also *Com.* v. *Mason,* 105 Mass. 163. In the recent case of *Brewer* v. *State,* 93 Ark. 479, we said, speaking of lost goods: "The rule clearly deducible from the authorities is that if the finder of lost articles neither knows nor has any immediate means of ascertaining the owner, and appropriates them to his own use, he is not guilty of larceny, whatever may be his intent at the time." But this doctrine has no application to estrayed domestic animals. As is said in *State* v. *Martin,* 28 Mo. 530: "It is with no propriety, either in view of custom or statutory law, that animals can be called lost goods here, simply because they are outside the owner's enclosures, and the owner does not know where they are. Such animals are not *lost* in the proper sense of the term; nor can the person who comes across them and feloniously appropriates them to his own use with any propriety be called the *finder,* as he might be if he, with the same

felonious intent, picked up a purse upon the highway. * * * And the fact that they are not branded with the owner's name is perfectly immaterial. It is sufficient for the person who comes across them to know they are not his property; and if he drives them off and converts them feloniously to his own use, he is as much guilty of larceny, when he is ignorant of their true owner, and their owner is ignorant of where they are, as he would be if both had full knowledge on both these points. * * * They (estray laws) have nothing to do with the criminal law, and are merely directory to promote commerce and afford facilities for the reclamation of stray animals." See also *People* v. *Kaatz,* 3 Parker, C. C. 129.

Third. Instruction number 4 is as follows: "If you find from the evidence that the defendant did, in fact, buy the steers and pay a consideration therefor, this would be no defense if it was a part of an agreement, or understanding, or conspiracy between the defendant and Johnson by which the larceny of the steers might be accomplished."

It is contended that there was no evidence of any conspiracy between Johnson and appellant, and that therefore the latter part of the above instruction is abstract. It was in evidence that a certain party was asked why he did not buy the cattle and replied, in the presence of appellant, "that he didn't want the cattle; that somebody told him that they had not been posted, and that he did not want any trouble," whereupon appellant stated with an oath: "I will buy them."

A witness who lived with Johnson is shown to have testified as follows:

"One night Blackshare came over there and stayed until bedtime. Blackshare and Johnson went out in the lot, and were out there probably an hour. Next morning Johnson went to his (witness') room before day and told him to get up, that he wanted him to help drive this yoke of cattle across the slough, and, I think, described the cattle. He called them butt-headed cattle—one lined black and one black. He got up and helped Johnson cross the slough; went across the country through the woods. When they came to a cypress slough, Johnson told him to go up the slough and see if he could find a place to cross, and while he was gone Johnson took the cattle and went

down the slough and tied them, and came back and met him and he saw a couple of men ride up and untie these cattle and ride off with them. Believe he said there was some horse tracks there, and he asked who had been there. Johnson asked if he didn't see Blackshare pass and he said no, and Johnson told him that Blackshare came by and threw him the money for the cattle, and he took it from his pocket. It was wrapped in a brown paper and counted out fifty dollars. Couldn't see any road where the cattle were led. Witness asked George Johnson what he was taking the cattle through the woods for, and George said there was a fellow named Happy Jack that he didn't want to know anything about it."

There was no objection to this testimony. This testimony, taken in connection with the evidence that appellant admitted that he bought the cattle from Johnson, paying for same the sum of fifty dollars, was sufficient, in connection with the other evidence, to warrant the court in submitting to the jury whether or not there was a conspiracy between appellant and Johnson to steal the cattle. The instruction was not abstract.

Fourth. The second count of this indictment, as stated, charges that the defendant knowingly received property stolen by another. This second count charges that the defendant did unlawfully, feloniously and knowingly receive into and have in his possession, with the intent to deprive the owner of his property, the two steers in question, and the material allegations of this count are that in this district, of this county, and within three years before the date of this indictment, the defendant received from a person who had stolen the steers in question, knowing them to have been stolen, with the intent to deprive the true owner of his property by so receiving them. If the evidence warrants it and requires it, the defendant could be found guilty of either of these counts, but not of both of them.

It is urged that the instruction, as read to the jury, did not contain the words "knowing them to have been stolen." But we find nothing in the record to show that the instruction containing these words was not read to the jury. The bill of exceptions contains the instruction as above set out, and it shows that the words "knowing them to have been stolen" were inserted in the instruction before "either of defendant's counsel

had argued the case to the jury." There is no affirmative show-ing that the words mentioned were not read. The bill of ex-ceptions indicates that they were read, and, in the absence of a showing to the contrary, that would be the presumption.

Fifth. The last contention is that the court erred in per-mitting the prosecuting attorney to make improper remarks in his closing argument. Counsel assert that the remarks were as follows: "That the defendant failed to put George Johnson (the alleged thief) and Isaiah Johnson, his father, and Jim Blackshare, a son of defendant, on the witness stand to' con-tradict statements made in the trial." We find no such assign-ments of error in the motion for new trial. Hence can not con-sider it. The record does show that the prosecuting attorney in his closing argument made the following remarks: "Why are all these people here? They came here to see if the law can be enforced; and I want to know, and they want to know, if property can be stolen and no explanation be offered, and a man go scot free." The ruling of the court in permitting the above remarks is properly presented for our consideration. The remarks were but the expression of the opinion of the prosecuting attorney. They were not calculated to influence a jury of sensible men to disregard the oath they had taken to try the cause according to the law and the evidence and a true verdict render. A majority of the court do not consider the remarks prejudicial error. For, fairly construed, the comments of the attorney could hardly be said to have reference to the failure of appellant to testify as a witness in explanation of the charge, but rather to the failure of the evidence adduced in the opinion of the attorney, to afford an explanation.

The judgment is therefore affirmed.