GENTRY *v.* STATE.

Crim. 3937

Opinion delivered September 23, 1935.

318

John E. Miller and C. E. Yingling, for appellant.

Carl E. Bailey, Attorney General, and Guy E. Williams, Assistant, for appellee.

MEHAFFY, J. Appellant was indicted for murder in the first degree, and was convicted for murder in the second degree, and his punishment fixed at twenty-one years in the penitentiary. He prosecuted this appeal to reverse the judgment of the circuit court.

Homer Nuchols testified in substance that he was in Seaborn Hassell's store when the appellant shot Hassell and was standing about nine feet from Hassell. The store was lighted with electric lights; the shooting occurred between 7 and 7:30; the appellant walked in to Hassell's store and said: "Seaborn, I thought you were a man," and he said, "Mr. Gentry, I am." Mr. Gentry then pulled his pistol and started shooting, and Mr. Hassell was facing him with his hands over the counter when the first shot was fired. Witness cannot say how many shots were fired, but there were three or more; when the first shot was fired, Mr. Hassell staggered backwards, and when Mr. Gentry quit shooting, he turned and went out of the door. Witness thinks it was something like twenty minutes before the officers got there; did not hear appellant say anything as he went out of the store. Mr.

Aundry was the only person in the store at the time of the shooting. Witness had been there about ten minutes when the shooting started. He was on a seat in front of the store talking to Frank Rose, Charlie Ellis, Ellis Chrisp, Ive Turnbow and Mr. Rouse. Up to the time appellant said what he did to Hassell, there had not been anything unusual to attract attention. The first notice that witness had that there was going to be trouble was when Gentry pulled his pistol. He pulled it with his right hand, and his left side was facing witness. After the shooting, and before the officers got there, a good many people came in the store and went out.

Matt Aundry testified substantially the same as Nuchols.

Leonard Ward testified in substance that Gentry said after the shooting: "Son, I shot Seaborn Hassell," and witness asked if he killed him, and appellant said he did not know whether he did or not, but he tried to. Appellant also said: "This has been going on for quite a while, and I am just now finding it out." Witness did not ask appellant what he meant because he thought he knew.

L. M. Sowell, city marshal at Searcy, testified that after appellant's arrest, he asked if Hassell was dead, and when told that he was he said: "I done what I intended to do."

Dr. F. L. Purnell testified substantially that he was a physician practicing at Kensett; knows the appellant; that shortly before the killing he saw appellant at Kensett armed with a pistol which was sticking in the waistband of his trousers on the left-hand side.

Evelyn Gentry, daughter of appellant, testified that when appellant came home she told her father that Seaborn Hassell had taken her mother off; that her father did not say he would kill the man who took her off; that her father went down to Hassell's and in a moment or two she heard shooting. When her father came back, he told witness to call the sheriff, and appellant talked to him. Her father had only one pistol, and she did not know whether he carried it with him or not; did not know why her mother left.

Tom Taylor testified that he knew Seaborn Hassell owned a pistol six or eight months ago.

The appellant testified that he had known Seaborn Hassell over two years before he moved to Higginson, and until a short time before the killing they had been friendly. Appellant was operating a store 100 feet from Hassell's store on the same side of the street. Appellant then testified about going to Augusta, and that he was armed at that time with a 32 automatic pistol; that he had some money with him and carried the pistol with him like he had on several occasions. When he got back home that night, he did not know that his wife had left until his daughter Evelyn told him. He did not make the statement in the presence of Ellis Chrisp that he would kill the man that took his wife away from Higginson. When his little daughter told him that his wife was gone, he thought he would go down and ask Seaborn where he carried her to. He had had a conversation with Seaborn on Friday morning before the killing about what Hassell had been telling appellant's wife and causing his wife to leave him. He testified that Hassell said: "By God, I am a man and can attend to my business, and you attend to yours." He had no further conversation with Hassell until the night of the killing. He went into Hassell's store and said: "Seaborn, I thought you was a man." He had reference to the conversation he had had with Hassell before. Hassell was standing behind the counter. Witness knew that Hassell owned a pistol and knew that Hassell kept it in a drawer of the showcase at the place where he was standing and he was standing there with his arm on top of the showcase when he said what he did. Hassell started backing away and moving his hands down by the showcase, and appellant thought he was reaching for a pistol. Appellant pulled out his pistol and shot him. He did not go there to kill him, but shot him to protect himself. He testified about telling his little girl to call the sheriff and about their conversation. He did not tell Mr. Ward that he aimed to kill Seaborn Hassell, but told him he hated to have to shoot him. He did not say in the presence of Mr. Sowell that he had done what he aimed to, but said

he had done what he had to. He testified that his wife left him in January, 1934, and went to Conway and was gone about six weeks. When he came home and found his wife gone, he did not know where she had gone and went to Hassell's store to ask him where he had carried her. He was six or seven feet from Hassell when he shot him; did not know how many times he shot him; he had an idea from previous conversations and his actions that Hassell was going to try to kill him.

Thelma Hassell testifying in rebuttal: said that there were no fire-arms in the store at the time her brother was killed; he had no pistol whatsoever, and had not had for several months.

T. C. Plant, the sheriff, testified that he made an examination of the bullet holes and thinks there were three; they were a little lower down on the wall than even with the showcase, probably six or eight inches lower, and appeared to range a little downward.

Appellant's first contention is that the case should be reversed because of the action of the court in excusing juror J. M. Blaylock. When Blaylock was called as a juror he was asked the following question by appellant's attorney: ''You have no such conscientious scruples against inflicting the death penalty that you couldn't return a verdict of that kind?'' Answer: ''If it was straight enough.'' This juror testified also that if the evidence convinced his mind beyond a reasonable doubt he would return a verdict of guilty, notwithstanding it would carry the death penalty. He also stated: ''There couldn't be any circumstantial evidence at all, it would have to be plumb straight.'' This examination of Blaylock occurred while the special judge, Armitage, was presiding, and the regular judge asked Judge Armitage to dictate into the record the questions asked the juror Blaylock.

Juror W. M. Moye was also excused by the court as being disqualified. The examination of this juror was practically the same as that of Blaylock. He testified that he would go by the evidence and that he did not know whether it would take a greater weight of evidence

in a capital case than any other kind. He testified that he did not believe in capital punishment.

This court said: "At times, too, improper persons, unsuited for jurors, endeavor to worm themselves upon the jury. As the trial judge has the juror before him, he can observe his manner and bearing, can note the amount of intelligence he displays, and judge his capacity for jury service, and whether he will be influenced by the opinion he has formed, or be able to disregard it. 'In such cases,' says Chief Justice Waite, 'the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than words. That is seen below, but cannot always be spread upon the record. Care should therefore be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.' 'The finding of the trial court upon that issue,' he says, 'ought not to be set aside by a reviewing court, unless the error is manifest.'" *Hardin* v. *State*, 66 Ark. 53, 48 S. W. 904; *Sullins* v. *State*, 79 Ark. 127, 95 S. W. 159.

"Without attaching any great importance to knowledge that was in the breast of the court and not developed in the examination, we remark that the presiding judge, who has an opportunity to observe the appearance and demeanor of jurors, must of necessity be invested with a large measure of judicial discretion in passing upon their qualifications. And the erroneous rejection of one who is summoned for jury service lays no sufficient foundation for a new trial." *Maclin* v. *State*, 44 Ark. 115.

"A large measure of jurisdictional discretion must be allowed the trial court in passing upon the qualification of jurors and ascertaining the state of mind of the jurors under examination affecting their competency." *Maroney* v. *State*, 177 Ark. 355, 6 S. W. (2d) 299; *Jackson* v. *State*, 103 Ark. 21, 145 S. W. 559.

Under our law and procedure, in the trial of questions of fact the jury's finding is conclusive where based on substantial evidence. One reason is that the jury sees the witnesses and is able to judge by their manner of testifying and their demeanor on the stand the weight of their testimony better than the appellate court. The

same reason applies to the examination of jurors by the judge. He sees the juror, hears his testimony, observes his demeanor, and is better able to judge of his competency than this court, and he has large discretion, and, unless it is manifest that there is an abuse of discretion, this court will not reverse the finding of the trial court.

It is next contended by the appellant that the court erred in holding that juror G. L. Lofton was not disqualified. This juror stated that he had served upon a jury in the circuit court of White County within the past two years, but he expressly stated that it was not on the regular jury, but that he was called in a special case. Appellant contends that, under the plain provisions of act 135 of the Acts of 1931, as construed by this court, the juror Lofton was disqualified and should have been excused. The act provides that no citizen shall be eligible to serve on either grand or petit jury oftener than one regular term of the circuit court every two years. This juror had not served on the jury at any regular term within two years. He was therefore not disqualified to serve.

The appellant, however, calls attention to the case of *Beavers* v. *State,* 187 Ark. 722, 61 S. W. (2d) 1113. The opinion in that case states: ''Each of these three citizens had served on the petit and grand juries of their county within two years.'' The court also said in the above case that it was thought by the trial court that the act above copied made jurors ineligible to serve on the regular panel if they had served on the regular panel in the circuit court within less than two years, but that it did not render them ineligible to serve as special jurors. We said that this act applied to special jurors as well as members of the regular panel. That is, if a juror has served on the regular panel within two years, he cannot serve either as a member of the regular panel or as a special juror. The act does not prohibit or make ineligible a juror unless he had served on the regular panel within two years.

Appellant also calls attention to *Hampton* v. *State,* 187 Ark. 869, 63 S. W. (2d) 277. In that case the court said: ''It is not service as a special juror which dis-

qualifies. The person rendered ineligible under the act of 1931 is one who has served on a grand or petit jury during the regular term of court."

This court decided this question after the decisions in the two cases referred to by appellant, and the court said: "Again, it is insisted that the trial court erred in holding Charles Pumphrey a competent juror to serve on this case. This contention arose under the following circumstances: Charles Pumphrey admitted on examination as a prospective juror that he had served as a juror at a murder trial in the same court within 60 days last past. Services as a special juror within two years does not disqualify a juror to serve on the regular panel. This question was decided adversely to appellant's contention in the case of *Hampton* v. *State,* 187 Ark. 869, 63 S. W. (2d) 277." *Banks* v. *State,* 187 Ark. 962, 63 S. W. (2d) 518.

It will be observed that this court has passed on this question, and has held that serving as special juror does not disqualify one from serving within two years. If one has served on the regular panel within two years, he is then ineligible to serve either as a special juror or on the regular panel.

Appellant next contends that the court erred in giving instruction No. 1, which is as follows:

"You are instructed that words which even amount to abuse and which are violent in their nature cannot justify an assault; and if you find from the testimony in this case that the defendant provoked the deceased by word or act to use violent or abusive language towards him for the purpose of bringing on a difficulty, and that when the deceased used such words that the defendant did assault the deceased and continued in his hostile demonstrations towards the deceased, and voluntarily pursued him and finally slew him in the combat voluntarily brought on by the defendant, even though the deceased fought a mutual fight with the defendant, until the defendant struck the blow that caused the death of the deceased."

Appellant calls attention to the case of *Lomax* v. *State,* 165 Ark. 386, 264 S. W. 823. The court in that

case said that there was no evidence upon which to predicate the instruction. The appellant himself testified in this case that, before the time of the killing, he had a conversation with Hassell about what the deceased had been telling his wife and causing trouble, and that deceased said to him: ''By God, I am a man and can attend to my business, and you attend to yours.'' And when he went to Hassell's store at the time of the killing the first thing appellant said, according to his own testimony, was: ''Seaborn, I thought you was a man.'' There was some other testimony about Hassell taking Gentry's wife away, and we therefore do not think that the instruction was prejudicial. Certainly the difficulty at the time of the killing was brought on by the appellant, at least according to all of the witnesses except the appellant himself.

We have carefully considered all the instructions given by the court, and, when considered as a whole, which must be done, we do not think that the jury could have been misled or that the appellant was in any way prejudiced by the court's giving this instruction.

Appellant next contends for reversal because of the argument made by the prosecuting attorney. The prosecuting attorney stated: ''Gentlemen of the jury, you see this vast throng of people here; they are not here out of idle curiosity to witness this trial; they are here through a feeling of insecurity and because of the rumbling all over this county that men fear their security and the security of their homes.''

The record does show that the prosecuting attorney in his closing argument made the following remarks: ''Why are all these people here? They came here to see if the law can be enforced; and I want to know and they want to know if property can be stolen and no explanation offered and a man go scot free.'' The court in commenting on the remark set out above, said: ''The remarks were but the expression of the opinion of the prosecuting attorney. They were not calculated to influence a jury of sensible men to disregard the oath they had taken to try the cause according to the law and the evidence and a true verdict render.'' *Blackshare* v. *State,*

94 Ark. 548, 128 S. W. 549; *Crow* v. *State,* 190 Ark. 222, 79 S. W. (2d) 73.

The appellant in this case objected to the remarks of the prosecuting attorney, and his objection was at the time overruled, but, after the argument of counsel for both sides, the court instructed the jury as follows:

"Gentlemen of the jury, this morning in the argument of counsel for the State, in the closing argument of Mr. Brundidge, certain remarks were made that the defendant excepted to, about the crowd being here, and that they were here, not out of curiosity, and about the rumbling over the county, and so on, the court instructs you not to consider that. All you are to consider is the evidence in the case and the law as given to you by the court."

In the first place, under the authority of the case of *Blackshare* v. *State, supra,* there was no error in the court's permitting the argument for the State, but, if it had been improper argument, the jury was told by the court in an instruction that they were to consider the evidence in the case and the law as given to them by the court, and instructed them specifically not to consider the argument made by the State's attorney.

There was ample evidence to justify the verdict. We find no reversible error, and the judgment is affirmed.