TURNER v. STATE.

4788                                          275 S. W. 2d 24

Opinion delivered January 24, 1955.

[Rehearing denied February 28, 1955.]

506

*Wm. I. Purifoy, Otis Linebarier, Hendrix Rowell,* for appellant.

*Tom Gentry,* Attorney General, *Thorp Thomas,* Assistant Attorney General, for appellee.

SAM ROBINSON, Associate Justice.   Appellant M. L. Turner was convicted of murder in the first degree, the verdict returned by the jury carrying with it the death penalty.

The evidence supports a finding of facts as follows: Appellant was divorced by his wife, Mrs. Bertie Turner, in October, 1951.   On Labor Day, 1953, Mrs. Turner was introduced to Lloyd R. Squire, a widower employed by the Kansas City Southern Railroad in the public relations department.   He lived in Little Rock, and in connection with his duties as an employee of the railroad company, Mr. Squire occasionally visited the city of Camden where both Mrs. Turner and her divorced husband, the appellant herein, lived.   Mrs. Turner is a deputy city clerk for the city of Camden.

On the evening of April 13, 1954, Mrs. Turner had dinner with Mr. Squire at a restaurant in or near Camden.   They also went to the Rocket Room, a place of amusement at the Hotel Camden, and later to the Plantation Club.   The next day, April 14, Mr. Squire went to Mrs. Turner's office and took her to lunch at the Duck Inn.   Mr. Turner, the appellant, had been out of town for several days on a visit to New Orleans and Florida, and during his absence from Camden he had left his

automobile with his divorced wife. He returned to Camden the evening of the 13th; on the morning of the 14th he called Mrs. Turner and stated to her: "I wish you would keep your g— d— Plantation Club friends from calling me and disturbing my rest, and keep your g— d— friends out of my car." Hence Mrs. Turner knew that Mr. Turner had returned to town and was angry.

When Mrs. Turner and Mr. Squire left the Duck Inn after finishing lunch April 14, she asked him to drive her to her apartment for the purpose of picking up her own car as she knew Mr. Turner would want his. She had left his car downtown with the key in it to make it available to him. Mr. Squire drove Mrs. Turner to her apartment; her car was parked at the rear of the driveway which goes alongside the apartment house. The car was facing the street; it had not been used for over a week. Mr. Squire drove his car up in the driveway, stopped, got out with Mrs. Turner and accompanied her to her car to see whether it would start. While they were both there at Mrs. Turner's car, the appellant Turner drove up, got out of his car, and started up the driveway. Turner had previously told Mrs. Turner that if he ever caught her with another man, he would kill both her and the other man. Mrs. Turner saw her divorced husband approaching, and knowing he was angry she suggested to Mr. Squire that he had better leave. Mr. Squire attempted to make his departure by walking out the driveway toward his car at the front; in doing so he met Turner. The evidence is convincing that Mr. Squire spoke to Turner, asking him if he was Bill Turner, and extended his hand to shake hands. Turner also made a gesture as if to shake hands, but jerked his hand back and drew a Colt 45 automatic pistol. No witness heard exactly what Turner said to Squire, but Turner appeared to be talking in a rapid, angry manner. Turner operated the mechanism of the gun in a way to throw a shell from the magazine into the barrel, and then struck Squire **a very severe** blow on the left ear with the pistol. The blow did not knock Squire down but knocked him into a stooping position. Turner then moved back a step or two and

fired twice, one bullet striking Squire in the chest; he died from the effects of the wound two days later.

Mrs. Turner was an eye-witness to the shooting; and Mrs. James L. Halligan was a witness to the extent that from an upper window of the apartment house she could see Mr. Turner; however, she could not see Mr. Squire. The evidence shows that Mr. Squire was not armed. The eye-witnesses are corroborated by the fact that two empty cartridges were found at the place where the shooting occurred, and one round of live ammunition for the 45 automatic was also found. This round of live ammunition being found at the scene of the shooting is highly significant; it is weighty evidence to the effect that Turner operated the mechanism of the gun to make certain there was a cartridge in the barrel; that actually the gun was loaded and the cartridge in the barrel was ejected out onto the ground and another cartridge injected into the barrel. The fact that Turner operated the gun to make sure there was a cartridge in the barrel is a strong circumstance going to show his intention.

As a defense, the appellant attempted to show, first, that the shooting was in self-defense; he says that Squire reached for his hip pocket; next, that the shooting was accidental, that he did not intentionally fire the pistol; and next, that he is insane. The jury found against the appellant on all his asserted defenses, and the testimony of the eye-witnesses coupled with the physical facts and circumstances is substantial evidence sufficient to sustain the verdict of the jury.

The shooting occurred April 14, 1954. Squire died about 3:00 a.m. April 16. On the same day, April 16, the prosecuting attorney filed a felony information in circuit court charging Turner with murder in the first degree.. On April 23 the defendant was arraigned and announced he had not employed counsel. A plea of not guilty was entered for him by the court, and two members of the local bar were appointed to defend him. At this time the case was set for trial on May 10, the next regular term of court beginning May 3. On April 24 there was

filed a motion for bail, and April 28 a petition for writ of habeas corpus. April 30 the motion for bail was withdrawn, and at the habeas corpus hearing bail was denied.

On May 7 there was filed a motion for continuance. At that time one of the attorneys representing defendant stated that he thought two additional weeks would be adequate time to make an investigation and prepare the defendant's case. The court granted nine days additional time, resetting the case for May 19.

On May 17, defendant having employed additional counsel, another motion for continuance was filed. This motion was prepared by Mr. Hendrix Rowell, an attorney who had been employed recently in behalf of the defendant. The motion sets out that Mr. Rowell was employed about 2:00 p.m. May 13, and alleges there was not sufficient time for either him or the other lawyers representing the defendant to prepare the case properly. The motion states that there are facts material to the defense which could be established if given further time; but the motion does not mention specifically any fact that could be established if given additional time.

The case went to trial on May 19. It is not shown how the defendant could be any better prepared on any of his alleged defenses at a later date than he was at the time of the trial. The pistol used by him was introduced in evidence; it is not shown that it is defective or that it would fire in an unusual manner. Defendant testified that there was a scuffle and that the pistol was thereby discharged, but he is contradicted by the eye-witnesses; and it is not shown that any additional evidence could be obtained to the effect that the shooting was an accident. As to the self-defense feature of the case, it is not suggested that there is any witness to the shooting that would be available at a later date but not available at the time of the trial. Moreover it would be extremely difficult to convince a jury by any testimony that an unarmed man reached for his hip pocket when confronted in a belligerent manner by an angry person with a pistol in his hand. As to the defense of insanity, there was

more than a month from the time of the shooting and death of the victim until the time of the trial; the defendant could have been examined by any number of psychiatrists of his own choice during that period of time, but none were produced at the trial. In fact, the defendant testified in his own behalf and there is nothing in his testimony that would lead the court to believe that he is insane.

In support of the contention that the court erred in over-ruling the motion for a continuance filed by Mr. Rowell on May 17, appellant cites the case of *Maxwell* v. *State,* 216 Ark. 393, 225 S.W. 2d 687. That case is readily distinguishable from the case at bar; there the defendant who was charged with rape was arrested on July 20, seven or eight hours after the alleged crime occurred. Because of public resentment he was removed from the county where the offense was alleged to have occurred, and kept until August 4. Then a certified copy of the information was served on him in the court house of the county where he was charged with the crime; he was again taken out of the county, but brought back two days later for arraignment; and at that late date six members of the local bar were appointed to represent him. This was on Saturday, August 6; the trial was set for Monday, August 8. It was shown that there were several features of the case that needed investigating, and that the attorneys did not know of their appointment until Saturday afternoon and could not possibly be ready for trial by Monday morning.

In *Meyer* v. *State,* 218 Ark. 440, 236 S.W. 2d 996, we said: ''The appellants had about three weeks to get ready for trial. This Court has held in a long line of decisions that Motions for Continuance are addressed to the sound judicial discretion of the trial court and a reversal can be had only where it is shown by the record that a refusal to grant a continuance was an arbitrary abuse of discretion. *Morris* v. *State,* 197 Ark. 778, 126 S. W. 2d 93; *Smith* v. *State,* 200 Ark. 1152, 143 S. W. 2d 190; *Collier* v. *State,* 202 Ark. 939, 154 S. W. 2d 569. The fact that the lawyer, who actually tried the case had

been employed only a few days, although other counsel had been representing the appellants from the first, is not sufficient to call for a reversal of the case. *Hamilton v. State,* 62 Ark. 543, 36 S. W. 1054; *Therman* v. *State,* 205 Ark. 376, 168 S. W. 2d 833."

The record does not justify a conclusion that the trial court abused its discretion in denying the motion for continuance.

On May 17 attorneys for defendant Turner filed a motion for a change of venue. The motion alleges that due to the publication of an article in a local newspaper purporting to set out the facts of the killing, public sentiment had been aroused against the defendant to such an extent that he could not receive a fair trial in Ouachita County. No witnesses were produced to support the allegations in the motion, nor were any affidavits of witnesses attached in support of the allegations. A copy of the newspaper containing the article complained of was made a part of the record. It does not appear that it was calculated to arouse public sentiment; no particularly large or alarming headlines were used, and the published account of the killing appears to be accurate according to the evidence later introduced at the trial, with the exception that it was stated in the newspaper that Squire was knocked to the ground and shot while in that position, when the evidence shows he was only knocked to a stooping position and shot while in that position. Under Initiated Act No. 3 the circuit court has broad powers in regard to granting or refusing a change of venue. Here we can not say the trial court abused its discretion. *Bailey* v. *State,* 204 Ark. 376, 163 S. W. 2d 141; *Robertson* v. *State,* 212 Ark. 301, 206 S. W. 2d 748; *Meyer* v. *State,* 218 Ark. 440; 236 S. W. 2d 996.

Appellant offered to put the sheriff, Bill Smead, on the stand for the purpose of asking him "if he recognizes that there is a demand for an immediate trial of this man among the people with whom he has conversed," and the court refused to permit this procedure; but no showing was made as to what Smead would have said.

Appellant cites *Hildreth* v. *State,* 214 Ark. 710, 217 S.W. 2d 622, but in that case it was shown that three attorneys had questioned numerous residents of Lee County, and every one of them thought Hildreth could not obtain a fair trial in the county but refused to make affidavit lest they incur the enmity of the general public and particularly of the interested persons; and one of the attorneys offered to swear that four members of the jury panel had told him they could not try the accused fairly. It was held that the court's action in refusing to hear the proffered testimony was contrary to established principles; but there it was shown what the testimony would be, and here it is not indicated what Smead would say.

As to defendant's motion that he be sent to the State Hospital for Nervous Diseases for a mental examination, this motion was filed May 17. In response to the motion the court appointed two physicians to examine the defendant. Dr. L. E. Drewrey reported: "This is to certify that I examined Mr. M. L. Turner of Camden, Arkansas, May 17, 1954, and find him to have no evidence of insanity or psychosis at this time. Nor do I find any evidence that insanity or psychosis was present on April 14, 1954, or subsequent to this date." Dr. W. H. Pruitt reported: "I have made such an examination to the best of my ability and report to you that as a result of that examination made on this date, I find no evidence of insanity and no evidence of any psychosis existing today or on April 14, 1954, and no indication of any insanity or psychosis at any time between those dates." The court over-ruled the motion.

Act 256 of 1949, Ark. Stats. § 43-1305, provides that whenever a person shall be informed against or indicted less than thirty days before the next session of the circuit court, the court shall direct examination by two reputable and disinterested physicians and shall order an examination of the defendant in the State Hospital for Nervous Diseases only when the court has reason to believe that the defendant might be insane, or upon the report of the examining physicians to the effect that

there are reasonable grounds for believing that the defendant might be insane. In this case the alleged crime was committed and the defendant was charged with the offense by a felony information within less than thirty days from the convening of the next session of circuit court; when the motion was filed asking that the defendant be committed to the State Hospital for observation and examination, the court appointed promptly two doctors to examine the defendant; and both doctors reported they could find nothing indicating that the defendant was insane. In these circumstances it can not be said as a matter of law that the court had reason to believe that the defendant might be insane.

It is true that attorneys for defendant filed a verified motion setting out facts which they contend indicate insanity on the part of the defendant; but allegations in the motion did not convince the trial court that there was reason to believe that the defendant might be insane. The motion sets out first, that the defendant has five major defects of a physical nature; this is no indication whatever that he is not mentally sound. Second, that there is a history of extreme nervousness over an appreciable length of time resulting in excessive drinking of intoxicants and the taking of nerve stimulants in order to sober up; this is not an allegation of insanity; this same condition is not unusual among many people who are perfectly sound mentally; moreover the defendant indicated in his testimony at the trial that no one had ever seen him drunk. Third, that over a long period of time he had been in a nervous condition due to domestic conditions as well as financial difficulties; this does not mean that he does not know right from wrong, or knowing right from wrong is unable to keep from doing the thing that is wrong. Fourth, that he had been subjected to humiliation and embarrassment by the acts of his brother; there is nothing to indicate insanity here. Fifth, that the defendant, although financially embarrassed, owns twenty suits of clothes and thirty pairs of shoes; many people who are perfectly sound mentally are extravagant in regard to their clothes. Sixth, that he has

delusions of persecution; this is an allegation of insanity as delusions of persecution are well known symptoms of insanity. Seventh, that he has made statements in regard to owning a lease worth $500,000 and his attorneys have been unable to locate the lease. Eighth, that he claims his attorneys are withholding certain information that would enable him to make bond; ninth, that he insists that his attorneys have a large sum of his money in their possession; and tenth, that there is a history of insanity in defendant's family. Six, seven, eight, nine and ten may be some indication of a defective mental condition on the part of the defendant, but standing alone these allegations made by defendant's attorneys are not sufficient to establish as a matter of law that the trial court had reason to believe the defendant might be insane. Especially is this true when it is taken into consideration that the court had the defendant examined by two reputable doctors who could find no indication of insanity.

To sustain the contention that the trial court should have granted appellant's motion to be committed to the State Hospital for a mental examination, *Wilhite* v. *State,* 158 Ark. 290, 250 S. W. 31 is cited. The affidavit filed by attorneys for Wilhite would lead any reasonable person to believe that the defendant might be insane. The motion alleged that the defendant was insane, that before the commission of the crime charged against him he had been confined in the insane asylum and had been released therefrom before his reason had been completely restored, and that at the time of the commission of the crime charged against him he was insane. The petition alleged that the appellant had a brother confined in the insane asylum and, as they believed, a sister in the insane asylum in Tennessee; that appellant's ancestors had been confined in insane asylums in Tennessee and Kentucky; and that on account of his insane condition he was unable to render any assistance in preparing for his defense against the crime charged against him. The court appointed three physicians to inquire into the sanity of the defendant, but they refused to serve because they

were not paid for their services, and the defendant was put to trial without any examination by any doctor. In the case at bar the petition that the defendant be committed to the hospital for mental examination did not contain allegations which in themselves would necessarily cause the court to reach the conclusion that the defendant might be insane; and furthermore, in response to the petition the court did have the defendant examined by two physicians.

The law permitting a defendant to be examined as to his sanity at the State Hospital for Nervous Diseases is not solely for the benefit of the defendants. Prior to the adoption of Initiated Act No. 3 providing for mental examinations of defendants by the doctors at the State Hospital, the state was considerably handicapped in the prosecution of those charged with crimes when the defense of insanity was interposed. In many instances the state would have no opportunity to have a psychiatric examination made of the defendant, especially when the defendant was out on bond.

Here, when the court denied defendant's petition to be committed to the State Hospital for examination, the defendant was not denied the right to assert insanity as a defense; he could have been examined by psychiatrists of his own choice and such doctors could have testified in his behalf; in addition he could have subpoenaed any layman of his choice to testify on the point; some witnesses did give testimony calculated to establish insanity.

Defendant filed a motion asking that he be permitted to cross-examine the doctors selected by the court to make the examination and report to the court; this motion was overruled. The statute does not contemplate that the doctors selected by the court to make an examination and report to the court should become witnesses subject to cross-examination. Their report does not go to the merits of the case and never gets before the jury at all. In the case of *People* v. *Esposito*, 287 N. Y. 389, 39 N. E. 2d 925, 142 A. L. R. 956, the trial court ordered a mental examination of the defendant for the

purpose of determining preliminarily whether "there is reasonable ground for believing that such defendant is in such state of idiocy, imbecility, or insanity that he is incapable of understanding the charge, indictment or proceedings, or of making his defense." The appellate court held there was no error although the defendant was not afforded an opportunity to contest the findings of the examiners.

If the defendant had been committed to the State Hospital for an examination, not only would the examining doctors there have been required to report to the court, but the law also provides that they shall be summoned as witnesses. Ark. Stat. § 43-1302. The report and testimony of the State Hospital doctors are used at the trial to establish the guilt or innocence of the accused. Hence of course the defendant has the right to be confronted by and to cross-examine witnesses testifying on the merits of the case. Smith v. State, 200 Ark. 1152, 143 S. W. 2d 190. But no rule of law requires that cross-examination be allowed of the doctors who make the examination in the first instance merely for the purpose of determining whether there are grounds for sending the defendant to the State Hospital for a mental examination.

The trial court excused several veniremen who indicated by raising their hands that they had an opinion as to the merits of the case. Also several of the jurors were excused because they indicated they might have some prejudice or bias. Others were excused because they did not believe in capital punishment. The court refused defense counsel permission to cross-examine these veniremen as to the reason for their opinion, bias, prejudice or belief. We can not say the court erred in refusing such cross-examination; it made no real difference as to why a person was prejudiced or why he had an opinion or why he did not believe in capital punishment; the point is, did these things exist? The trial court has an opportunity to observe the juror, his manner and bearing, the amount of intelligence he displays,

and to judge his capacity for jury service. *Gentry* v. *State,* 191 Ark. 317, 86 S.W. 2d 26.

Moreover, even if it is assumed the court erred in excusing certain jurors, it is not such an error as calls for a reversal. In *Maclin* v. *State,* 44 Ark. 115, it is said: "Without attaching any great importance to knowledge that was in the breast of the court and not developed in the examination, we remark that the presiding judge, who has an opportunity to observe the appearance and demeanor of jurors, must of necessity be invested with a large measure of judicial discretion in passing upon their qualifications. And the erroneous rejection of one who is summoned for jury service lays no sufficient foundation for a new trial."

"Neither the dismissal by the circuit court of a juror from the regular panel on account of the feeble state of the juror's health, nor the rejection of two of the talesmen because they had formed opinions, requires any consideration here, for those matters were clearly within the discretion of the court." *Hamilton* v. *State,* 62 Ark. 543, 36 S. W. 1054.

"Whether the court was right or wrong in this, it is not material to decide, for if wrong, the erroneous rejection of a talesman would be no sufficient cause for granting the appellant a new trial. He had no legal right to have that particular person as a juror. The court might have excused the talesman from serving on the jury for any cause deemed sufficient in its discretion, without legal prejudice to appellant." *Wright* v. *State,* 35 Ark. 639.

"But whether the court was right or wrong in this, it is not material to decide, for if wrong, the erroneous rejection of a talesman would be no sufficient cause for granting the appellant a new trial." *Hurley* v. *State,* 29 Ark. 17.

"As to the rejection by the court of the talesmen in the above manner, we deem it most conducive to the ends of justice to adhere to the rule, long ago announced

by this court, that 'the erroneous rejection of a talesman is no sufficient cause for granting the appellant a new trial'." *Vaughan* v. *State,* 58 Ark. 353, 24 S. W. 885.

Appellant complains of the conduct of the trial in general. We have read the entire record, and it appears that the defendant received a fair trial. One of the things complained of by appellant is that one of the forms for a verdict furnished to the jury read: "We, the jury, find the defendant M. L. Turner guilty of the crime of murder in the first degree as charged in the information, and assess his punishment at death by electrocution." That part reading "and assess his punishment at death by electrocution" was scratched out. Upon the verdict being read, "We the jury find the defendant M. L. Turner guilty of the crime of murder in the first degree as charged in the information", the court said: "I want to ask you gentlemen if all of you understand this verdict carries a compulsory death sentence"; and the foreman replied, "We did." The jury was then polled, each one being called by his name separately, and each replied that the verdict returned was his verdict. When the jury finds the defendant guilty of murder in the first degree as charged in the information and does not fix the penalty, the law fixes the penalty at death. *Smith* v. *State,* 205 Ark. 1075, 172 S. W. 2d 248; *Clark* v. *State,* 169 Ark. 717, 276 S. W. 849; *Bullen* v. *State,* 156 Ark. 148, 245 S. W. 493.

We have diligently searched the record seeking errors, and finding none, the judgment is affirmed.

Ed. F. McFADDIN, Justice, concurring. There is one point in this case that has given me most serious concern: it relates to the refusal of the Trial Court to allow Turner's attorneys to cross-examine Drs. Drewrey and Pruitt. But after reading the transcript, I have concluded that no error was committed under the situation existing. I am concurring to give the reasons for my conclusions on this point.

Here was the situation existing:

(1)   Turner's attorneys filed a motion that he be committed to the State Hospital for examination as to sanity.   The Court denied that motion; but—at the request of the defendant—appointed Dr. L. E. Drewrey and Dr. W. H. Pruitt to examine Turner and report to the Court their findings as to his present mental condition.

(2)   Each of these doctors filed a written report with the Court, stating the opinion of such doctor to be that Turner was sane at the time of the commission of the alleged offense, and also at the time of the examination.

(3)   Then Turner's attorneys filed a motion to be allowed to cross-examine the two doctors, and the Court denied the motion.   It was this ruling, denying the desire of the lawyers to cross-examine the doctors, that gave me serious concern; but the record shows that the doctors were appointed *at the request of Turner and his attorneys.*   Since they were Turner's selected doctors, he would have no right to cross-examine them.   Here is an exact copy of page 33 of the transcript:

"Thereupon, and in open Court, counsel for defendant file a Motion to commit the defendant to the State Hospital for Nervous Diseases; this motion is presented, argued, considered and by the Court overruled.   Exceptions of the defendant saved.

"*At the request of the defendant, it is now ordered and adjudged by the Court that Dr. L. E. Drewrey and Dr. W. H. Pruitt,* practicing physicians of Camden, Ouachita County, Arkansas, *are hereby appointed to examine the defendant* at such time and place as they may deem proper, but without unnecessary delay, and to report to the Court the result of their examination."   (Italics my own.)

The law has always been that a person presently insane should not be tried during such condition.   Section 157 of the Code of Practice in Criminal Cases (adopted in this State in 1869) became § 2277 of Kirby's Digest, and

§ 3881 of Pope's Digest; and in *Duncan* v. *State,* 110 Ark. 523, 162 S. W. 573, we said of these Statutes:

"The statutes of this State provide that 'if the court shall be of the opinion that there are reasonable grounds to believe that the defendant is insane, all proceedings in the trial shall be postponed until the jury be impaneled to inquire whether the defendant is of unsound mind, and if the jury shall find that he is of unsound mind the court shall direct that he be kept in prison, or conveyed by the sheriff to the lunatic asylum, and there kept in custody by the officers thereof until he is restored. . . .' (Kirby's Digest, § 2277); also that, where a defendant appears for judgment, 'he may also show that he is insane. If the court is of the opinion that there be reasonable grounds for believing he is insane, the question of his insanity shall be determined by a jury of twelve qualified jurors,' etc. Kirby's Digest, § 2440.

"Both of these statutes are, in substance, reaffirmation of common law rules of criminal procedure, and the practice thereunder has been referred to and recognized in many decisions of this court, the reason for these statutes and the original rules of procedure which they reaffirm being that the trial should be postponed when the defendant is incapacitated, on account of his unsoundness of mind, to rationally conduct his defense, or, after verdict, to intelligently give reason why judgment should not be pronounced."

Other cases involving this Statute are *Kelley* v. *State,* 156 Ark. 188, 246 S. W. 4; and *Wilhite* v. *State,* 158 Ark. 290, 250 S. W. 31.

To force a defendant to trial while he is presently insane would violate the fundamental principles of common law justice. Blackstone, Book 4, page *24 (star page), says:

"Also if a man in his sound memory commit a capital offence, and before arraignment for it he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that

he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence? If, after he be tried and found guilty, he loses his senses before judgment, judgment shall not be pronounced; and if, after judgment, he becomes of nonsane memory, execution shall be stayed: for peradventure, says the humanity of the English law, he might have alleged something in stay of judgment or execution. . . .''

See also Annotation 142 A. L. R. 961, entitled: ''Investigation of present sanity to determine whether accused should be put, or continue, on trial.''

In the case of *Forby* v. *Fulk*, 214 Ark. 175, 214 S. W. 2d 920, we held that the said § 3881 of Pope's Digest—the Statute referred to in the quotation from *Duncan* v. *State, supra*—had been repealed by Initiated Act No. 3 of 1936. At that time, the said Initiated Act contained language which made it mandatory for the Trial Court to send the defendant to the State Hospital for examination as to mental condition (either at the time of the alleged crime or at the time of the trial), whenever such suggestion was made. *Lambert* v. *State,* 213 Ark. 567, 211 S. W. 2d 431. Thus the defendant's right, to have his present sanity investigated prior to trial for the alleged offense; was fully protected. There is some language in *Forby* v. *Fulk, supra,* which might be understood to indicate that insanity at the time of trial could be interposed as a defense at the time the defendant is being tried for the offense alleged. But insanity at the time of the trial is not a defense to the crime. It is merely a right to have the trial for the crime postponed until the accused becomes sane. The fact that a man might be perfectly sane when he committed the offense, and be insane at the time of the trial, is no defense to the alleged crime. Present insanity is only a *ground for postponement of trial* for the alleged offense.

After our opinion in *Forby* v. *Fulk, supra,* the Legislature, by Act 256 of 1949, in effect eliminated from Initiated Act No. 3 of 1936 so much thereof as made it *mandatory* on the Circuit Court to commit an accused to the

State Hospital for examination, regardless of when the said motion should be made; because the Act 256 provided that in a case like the one here, the Circuit Court would not be required to commit the accused to the State Hospital unless the Circuit Court ". . . has reason to believe that the defendant might be insane, or upon report of the examining physicians to the effect that there are reasonable grounds to believe the defendant to be insane. . . ." Thus, the effect of Act 259 of 1949 was to reinvest the Circuit Court with discretion, which, of course, must be exercised reasonably and judiciously, and without arbitrariness or caprice.

The point that the appellant here urges is that the Court was arbitrary in the exercise of its discretion in refusing to allow appellant's counsel to cross-examine Drs. Drewrey and Pruitt. If these doctors had been selected by the State or by the Court, then I am firmly of the opinion that the counsel for Turner would have had the right to cross-examine the doctors, and that a refusal of such right would be an arbitrary act. But here, the record—as copied in this opinion—shows that these doctors were requested by the attorneys for the accused. I can see nothing arbitrary in the Court refusing the attorneys for the accused the right to cross-examine the doctors that they had selected.

Therefore, I concur in the affirmance of this case.