BULLEN *v.* STATE.

Opinion delivered December 4, 1922.

1. HOMICIDE—VERDICT OF MURDER IN FIRST DEGREE.—Where the jury, in a prosecution for murder in the first degree, were instructed that, upon a verdict of guilty of murder in the first degree without fixing the punishment, the law would impose the punishment of death, but that the jury might reduce the punishment to life imprisonment, a verdict of guilty of murder in the first degree, without fixing the punishment, calls for a death sentence.

2. INDICTMENT AND INFORMATION—INDICTMENT ALLEGING DIFFERENT MODES OF KILLING.—Where murder may have been committed in different modes and by different means, the indictment may allege the different modes and means in distinct counts, and the State will not be compelled to elect upon which count it relies.

3. CRIMINAL LAW—CONFESSIONS OF GUILT.—Confessions of guilt, to be admissible, must be free from the taint of official inducement proceeding either from hope of gain or torture of fear.

4. CRIMINAL LAW—ADMISSIBILITY OF CONFESSIONS—HEARING.—The approved practice is to withdraw the jury while hearing the evidence upon the question whether confessions of guilt proceeded from official inducement.

5. CRIMINAL LAW—HARMLESS ERROR.—In a prosecution for murder, there was no prejudice to defendants because the jury was not withdrawn during testimony concerning the admissibility of so-called confessions where neither of the witnesses testifying was indicted, and no inducements had been held out to them; and where one of them, though arrested as an accomplice, testified because his relatives told him to do so, and the other was threatened only by defendants.

6. CRIMINAL LAW—NECESSITY OF MOTION FOR NEW TRIAL.—An exception to the admission of testimony, not brought forward in the motion for new trial, will not be considered on appeal.

7. HOMICIDE—HARMLESS ERROR.—Defendants, prosecuted for murder, were not prejudiced by testimony of deceased's wife that she and her husband were friendly, where she was not present at the crime nor involved in it.

8. CRIMINAL LAW—TESTIMONY OF CONFESSION.—Testimony of a witness as to a confession by one of the defendants in the presence of his co-defendants was admissible.

9. WITNESSES—EXAMINATION—LEADING QUESTIONS.—It is within the court's sound discretion to permit leading questions on direct examination.

10. CRIMINAL LAW—TESTIMONY OF CONSPIRATOR.—The rule that when the object of a conspiracy has been accomplished, the subsequent acts and declarations of one conspirator are inadmissible to show guilt of the others, does not exclude the testimony of a conspirator as to matters which he saw and heard.

11. WITNESSES—IMPEACHMENT ON CROSS-EXAMINATION.—Defendants taking the stand in their own behalf may, for the purpose of testing their credibility, be cross-examined as to other crimes committed by them.

12. CRIMINAL LAW—INSTRUCTION—REPETITION.—Where the court fairly submitted the question of reasonable doubt in a prosecution for murder, it was not necessary to charge that "the jury must have an abiding conviction to a moral certainty of the guilt of accused to justify a conviction."

13. CRIMINAL LAW—INSTRUCTIONS.—Where the court fully instructed the jury on the questions of reasonable doubt and presumption of innocence, there was no error in refusing to instruct that "no juror should do violence to his own conscience; rather than this he should stand on his own convictions, even though such stand resulted in a mistrial."

14. HOMICIDE—SUFFICIENCY OF EVIDENCE.—Evidence *held* to identify a body as that of deceased and to sustain a conviction of murder in the first degree.

Appeal from Ashley Circuit Court; *Turner Butler,* Judge; affirmed.

*William Beauregard Stuckey,* for appellants.

*J. S. Utley,* Attorney General; *Elbert Godwin* and *W. T. Hammock,* Assistants, for appellee.

Hart, J. . F. G. Bullen, Duncan Richardson and Ben Richardson were separately indicted for the crime of murder in the first degree, charged to have been committed by killing Ira H. Culp in May, 1922, in Ashley County, Ark.

At the request of the defendants, the cases were consolidated, and the defendants were jointly tried before a jury. The jury returned separate verdicts, finding each defendant guilty of murder in the first degree, as charged in the indictment.

The court had told the jury that, under such a form of verdict, the law fixed the penalty at death by electrocution. The court also instructed the jury that, under the statute, it might find each defendant or all of them guilty of murder in the first degree, and fix the punishment at imprisonment for life in the State Penitentiary.

From the judgment and a sentence of death pronounced by the court the defendants have duly prosecuted an appeal to this court.

A verdict in this form was approved by the court in *Kelley* v. *State,* 133 Ark. 261. Besides this, under the instructions given by the court, there can be no doubt as to the punishment intended by the jury. The court expressly told it that the law would impose the penalty of death upon the verdict in the form returned by the jury, and that, if the jury intended to reduce the punishment, it might do so, under the statute, by returning a verdict fixing the punishment at imprisonment for life in the State Penitentiary.

Counsel for the defendants assign as error the overruling of the motion of the defendants to compel the State to elect upon which count or paragraph of the indictment it intended to rely for the conviction of the defendants.

In the first part of the indictment it is charged that the defendants killed the deceased by shooting him, and in the second part that they killed him by striking him with an ax. This court has held that, if the offense may have been committed in different modes and by different means, the indictment may allege the modes and means in distinct counts. *Howard* v. *State,* 34 Ark. 434, and *Franklin* v. *State,* 153 Ark. 536.

The next assignment of error is that the court erred in refusing to grant the request of the defendants to hear testimony in the absence of the jury on the question of whether or not Filmore Gaul and Bill Bowden were induced to give their testimony by bribes or threats.

The well-established rule is that confessions of guilt, to be admissible, must be free from the taint of official inducement proceeding either from the hope of gain or the torture of fear. The approved practice is to withdraw the jury while the evidence on this point is being heard. The reason is that, if the court should not admit the evidence, the defendant might not be prejudiced by the hearing. In the case at bar the confessions were admitted in evidence, and the defendants did not show that the testimony of the witnesses in question was given by any inducement of gain or fear. On the other hand, the deputy sheriff who had the witnesses in charge testified that no inducements were held out to them, either of hope or fear; and the witnesses themselves testified to that effect. Bowden was not charged with being implicated with the crime, and was only held by the officers to be used as a witness. Filmore Gaul was arrested as an accomplice, but gave his testimony as the result of being told by some of his relatives to tell the truth. It is true, Gaul made other statements, but he says this was done under threats made by the defendants. Therefore, no prejudice could have resulted to them from the action of the court. *Greenwood* v. *State,* 107 Ark. 468, and *Dewein* v. *State,* 114 Ark. 472. Moreover, Gaul and Bowden were not defendants, and their testimony was not a confession by them; but, on the other hand, it was

the testimony of witnesses of matters and things they saw and heard and about which they had personal knowledge. Hence any promises or threats made to induce them to testify would only go to their credibility as witnesses. The witnesses claimed they were telling the truth at the trial.

The next assignment of error is that the court erred in permitting Mrs. Ira H. Culp to testify, on direct examination, that the relations between her and her husband were friendly. We do not think that this assignment of error is well taken, because it is not made a ground for a motion for a new trial by the defendants. An exception to the admission of testimony which is not brought forward in the motion for a new trial will not be considered on appeal. *Ince* v. *State,* 77 Ark. 418; *Gooch* v. *State,* 150 Ark. 268; and *Freeman* v. *State,* 150 Ark. 387. Besides this, there was nothing unfavorable to the defendants in allowing the wife to make the statement that she had been on friendly terms with her deceased husband. She was not present when the crime was committed and was not in any way involved in it. Therefore there was no prejudice in the introduction of the testimony. *Shinn* v. *State,* 150 Ark. 215.

The next assignment of error is that the court erred in permitting Filmore Gaul to testify that F. G. Bullen told him about taking an ax and cutting off the arms and legs of the deceased in the house, after he had been shot by Ben Richardson.

Filmore Gaul was a boy sixteen years of age, and, according to his testimony, accompanied the defendants to the scene of the killing on horseback, but remained on his horse and took no part in the killing. The defendants first called Ira H. Culp out on the porch, and he came out dressed in his night-clothes. The defendant, Ben Richardson, then shot at Culp and missed him. Culp shot back at Richardson twice and missed him. Ben Richardson then shot at Culp again, and Gaul saw Culp fall on the porch. The three defendants then went into the house. Duncan Richardson got a double-bitted ax in

front of the woodpile and carried it into the house with him. Ben Richardson and F. G. Bullen got Culp by his arms and dragged him back into the house. Dunk Richardson followed them into the house. This much the witness saw. He then testified that the defendants cut off the arms and legs of Culp, and when asked why he knew this, he stated that F. G. Bullen told him so. He also testified that Ben and Dunk Richardson were present at the time. The witness also heard the sound of an ax cutting while they were in the house.

There was no error in the admission of the testimony. It was not testimony of the declarations of a co-conspirator after a crime had been committed and the conspiracy ended, but it was testimony in the nature of a confession made by F. G. Bullen to the witness in the presence of his codefendants. Therefore this assignment of error is not well taken.

The next assignment of error is that the circuit court erred in refusing to exclude the whole testimony of Filmore Gaul, on the ground that his direct examination was extremely leading. In the first place, it may be said that his examination was not leading, and, in the next place, it is always within the sound discretion of the trial court to permit the witness to be asked leading questions, and it cannot be said that there was an abuse of discretion in this respect in the examination of Filmore Gaul.

The next assignment of error is that the circuit court erred in refusing to strike out the testimony of Filmore Gaul on the ground that he was a coconspirator, and that his testimony was not admissible to connect any others with commission of the crime. In support of their contention, the defendants cite cases to the effect that, when the object of the conspiracy has been accomplished, the subsequent acts and declarations of one of the conspirators are not admissible in evidence for the purpose of showing the guilt of the others. This well-known rule of law has no application to the testimony of Filmore Gaul. According to his own testimony, Filmore Gaul

went with the defendant to the scene of the killing, but did not participate in it. Whether he did or did not participate in the killing has no bearing on the assignment of error now under consideration. The witness testified to matters which he saw and heard. Testimony of matters coming under the personal observation or knowledge of a witness are not acts or declarations of a coconspirator. They are admissible as a narrative of things heard and seen by the witness, and which come within his own personal knowledge.

The next assignment of error is that the court erred in permitting the prosecuting attorney to cross-examine the defendants as to whether or not they had been guilty of other murders in that vicinity. The defendants took the stand in their own behalf, and, for the purpose of testing their credibility as witnesses, they might be cross-examined as to other crimes committed by them. *Shinn* v. *State,* 150 Ark. 215.

The next assignment of error is that the court erred in refusing to give instruction No. 5-B, which is as follows:

"I charge you further that the jury must have an abiding conviction to a moral certainty of the guilt of the accused to justify a conviction."

The court fully and fairly submitted to the jury the question of reasonable doubt, and it was not required to multiply instructions on the same point.

The next assignment of error is that the court erred in refusing to give instruction No. 5-C. This instruction is as follows: "I charge you further that, in your effort to harmonize your views for the purpose of reaching a verdict, no juror should do violence to his own conscience; rather than this, he should stand on his own convictions, even though such stand resulted in a mistrial." We do not think there was any error in refusing to give this instruction. The court gave full and fair instructions on the question of reasonable doubt and on the presumption of innocence of the accused. We do not deem it necessary to prolong this opinion by any further dis-

cussion of the instructions asked by the defendants. They were either argumentative in form, or fully covered by the instructions given by the court. The defense of the defendants was that they were at home when the crime was committed. The court fully instructed the jury on the question of alibi and the credibility of the witnesses.

The court also submitted to the jury the question of whether or not Filmore Gaul was an accomplice of the defendants, and also told the jury that, if it found him to be an accomplice, it could not convict on his uncorroborated testimony, and that the corroboration would not be sufficient if it merely showed that Culp was killed and the circumstances thereof.

Finally, it is insisted that the evidence is not legally sufficient to support the verdict. Filmore Gaul, the principal witness for the State, was about sixteen years old when the crime was committed. According to his testimony, Ira H. Culp was killed by the defendants at his own home in Ashley County, Ark., on Thursday night, May 11, 1922. Filmore Gaul was living with his grandfather, Randall Bullen, and his wife, at the time the crime was committed. Their dwelling house had three rooms. It had two front rooms, and a kitchen behind them running the full length of the front rooms. Gaul went to bed that night at nine o'clock. F. G. Bullen, sometimes called Coley, and a Mrs. French were also living with Randall Bullen at the time the offense was committed. After Filmore Gaul had gone to bed on the night of the killing he was awakened by hearing Ben Richardson calling Coley. F. G. Bullen heard Ben Richardson calling him, and went out of the house and talked to him. In about fifteen minutes Bullen came back into the house and told Gaul to get up and go and stay all night with Ben Richardson, so that they could go hog-hunting the next morning. Bullen and Gaul then saddled their horses and rode off with Ben Richardson down to Nathan Morris' at La-Ark, and found there Dunk Richardson sitting on his black mare. Ben Richardson was riding a gray horse, Bullen a bay mare, and

Gaul a sorrel horse with a blaze face. Gaul did not carry a gun; Bullen carried a 38 special with a six-inch barrel; Ben Richardson a 38-55 rifle, and Dunk a ten-gauge shotgun. They rode up to the gate at Culp's house, and Ben and Dunk Richardson and F. G. Bullen got down and hitched their horses. There was a full moon. Gaul remained on his horse. After hitching their horses, Ben and Dunk Richardson swapped guns. Dunk took the rifle and Ben the shotgun. They told Gaul they were going to kill old man Culp. Gaul said, "Don't kill him." They said they were going to kill the damned old Yankee, and that if Gaul told it they would kill him. Dunk Richardson climbed the fence and got behind some rolls of fence wire. Ben Richardson stopped beside the gate. Bullen got behind the tank right at the corner of the house. Ben then called Culp. Culp came out on the gallery in his night-clothes. Ben Richardson shot at Culp and missed him. Culp shot back at Ben twice. Ben then shot again at Culp and killed him. Gaul saw Culp fall on the porch, and he did not struggle after falling. Dunk then went out in front of the woodpile and got a double-bitted ax, which he carried in his hand into the house. Ben and Bullen got Culp by his arms and dragged him back into the house. Dunk followed them in. They carried Culp into a room next to the back porch, and Gaul heard the sound of an ax cutting. The defendants then set fire to the house, and came out. F. G. Bullen told Gaul, in the presence of Ben and Dunk Richardson, that they had cut off Culp's arms and legs. When they came out of the house, Ben Richardson looked at his watch, and it was 2 o'clock in the morning. They again told Gaul that if he ever told about the crime they would kill him. Dunk said that they had killed Culp because he had been stealing their hogs. The parties then separated and went to their respective homes.

Will Bowden, a boy seventeen years of age, was also a witness for the State. According to his testimony, he lived with B. B. Richardson, the father of Ben Richardson and Dunk Richardson. Ben Richardson lived with

his father, and slept in the same room with Will Bowden. On the night that Culp was killed, Dunk Richardson came to the home of B. B. Richardson about dark, riding his black mare and carrying his ten-gauge shotgun. Dunk and Ben Richardson rode away from the house that night. Ben carried a 38-55 high-powered rifle and Dunk his ten-gauge shotgun. The witness did not know what time of night they got back. Ben was in bed when he waked up the next morning. At the barn the next morning Ben, Dunk and old man Richardson were talking about old man Culp. Dunk told old man Richardson that they had got shut of the old man last night. The latter asked, "What old man?" and Dunk replied "That damned old Yankee". Then Mr. Richardson asked "How did you get rid of him?" Dunk said, "They killed him, chopped him up and burned the old son-of-a-bitch up." This was Friday morning, and the witness subsequently learned that Culp had been killed the night before.

According to the testimony of Mrs. Randall Bullen, Filmore Gaul was her grandson, and F. G. Bullen was her nephew. They lived with her and her husband at the time Culp was killed. On the night of the killing some one, who she thought was Ben Richardson, came to her house and called Coley, meaning F. G. Bullen. Coley got up and went outside, and she heard him talking to some one. Coley then came back into the house, and later he and Filmore Gaul went out. She heard their horses' hoofs as they all left the place. They came in the next morning when she was cooking breakfast. She did not know where they had been all night.

According to the testimony of Mrs. Ora French, she was living with Mr. and Mrs. Randall Bullen at the time Culp was killed. She went to bed about 7:30 o'clock that evening, and Filmore Gaul and Coley Bullen were at home at that time. They were there the next morning when she awoke. On Friday a week later she washed F. G. Bullen's overalls, and they had blood on them.

Another witness testified that on the night of the killing he saw four men on horseback riding down the

road towards the deceased's house, but did not recognize any of them.

A tenant on the farm of Ira H. Culp went to Culp's home early the next morning after the killing. He found that Culp's house had been burned down, and found Culp's body in the fire, burning.

D. A. Whitaker went to the Culp place at six-thirty o'clock on the morning of May 12, 1922. The house had burned down. The witness saw the remains of a body lying right beside a bed. It was a human body, and, with other persons, they took it out of the fire. They found a bunch of keys, a pair of pliers, and a piece of dental work in the fire.

The wife of the deceased testified that she lived in Wilmot, Ark., and saw her husband last on Thursday morning, May 11, 1922. She identified the bunch of keys, the pair of pliers and the piece of dental work taken out of the fire as the property of her husband.

Dr. Harrington, a practicing physician at Wilmot, Ark., went to the home of the deceased early in the morning on May 12, 1922. The house had burned down, and close to where there had been a bed, a body was found lying on its right side. On first examination the witness could not tell that it was a human body, because it had no legs. He cut the heart open and examined the valves. He then examined the left lung and the brain and pieces of skull. From his examination of the heart, lung, skull and other parts, the doctor said that it was a human body.

On cross-examination the witness said that he was not right sure that the skeleton was that of a human being. He further stated that he could not say from the body that it was a human body, but that from the brain he could say that it was a human body. He also testified that the skin left on the body had hair on it like that of a human being.

The defendants were witnesses for themselves, and denied the killing. They claim that they were at home on the night of the killing, and did not leave there at any

time during the night. Their testimony was corroborated by that of all the other members of the family except Filmore Gaul, Bill Bowden, and Mrs. Randall Bullen.

We do not deem it necessary to set out in detail the evidence adduced in their behalf, for, in testing the legal sufficiency of the evidence to support the verdict, the evidence for the State alone need be considered. It is perfectly plain, from the evidence of the State, that the killing was the result of deliberation and premeditation. That the killing was deliberately planned as the result of premeditation on the part of the defendants is shown by the fact that they went armed in the night time to the home of the deceased and called him out on his front porch, and then shot him down, with a gun carried with them for that very purpose. They then hacked the arms and legs off of the body and set fire to the house, evidently for the purpose of concealing the crime.

Filmore Gaul was the principal witness for the State, and, even if the jury believed that he was an accomplice of the defendants, it might have found that his testimony was amply corroborated by the other evidence. Will Bowden testified that, on the morning after the killing, Dunk and Ben Richardson were talking about the killing to their father at his barn. They told him that they had killed Culp and then chopped him up and burned him. This statement was in the nature of a confession by them that they had committed the crime. The finding of the charred body in the burned house tended to corroborate the confession. A bunch of keys, a pair of pliers and some dental work, which were identified as the property of the deceased, were found near the burned body. Mrs. Randall Bullen testified that some one, who she thought was Ben Richardson, waked up her nephew, F. G. Bullen, and, after talking with him for some time outside the house, F. G. Bullen came back into the house and got Filmore Gaul, and all of the parties left the place together. They did not return until she was getting breakfast early the next morning. All these facts and circumstances were sufficient to corroborate the testi-

mony of Filmore Gaul, and warranted the jury in return
ing a verdict of murder in the first degree against the
defendants.

But it is insisted that the body found in the burned
house was not identified as that of a human being. We
cannot agree with counsel in this contention. It is true
that the physician who examined the body testified that,
because it was burned so badly and because it had no
legs, he was not certain that it was a human body. At
another place in his testimony, however, we find that he
stated that the skin and hairs remaining on the body re-
sembled that of a human being, and that from the ex-
amination of the brain he felt certain that it was a hu-
man body.

There is no reversible error in the record, and the
judgment in each case must be affirmed.