William L. **MAXWELL**, Appellant,

v.

Dan D. **STEPHENS**, Superintendent of Arkansas State Penitentiary, Appellee.

No. 17729.

United States Court of Appeals Eighth Circuit.

June 30, 1965.

Ridge, Circuit Judge, dissented.

Frank H. Heffron, New York City and George Howard, Jr., Pine Bluff, Ark., Jack Greenberg and James M. Nabrit, III, New York City, and Harold B. Anderson, Little Rock, Ark., and also Leroy D. Clark and Michael Meltsner, New York City, of counsel, for appellant.

Jack L. Lessenberry, Chief Asst. Atty. Gen., Little Rock, Ark., Bruce Bennett, Atty. Gen., Little Rock, Ark., on the brief, for appellee.

Before MATTHES, BLACKMUN, and RIDGE, Circuit Judges.

BLACKMUN, Circuit Judge.

William L. Maxwell, a Negro possessing an eighth grade education, stands convicted by a jury in the Circuit Court of Garland County, Arkansas, of the crime of rape, as defined by § 41–3401, Arkansas Statutes 1947. The offense was committed on November 3, 1961. Maxwell at the time was 21 years of age. The jury did not "render a verdict of life imprisonment in the State penitentiary at hard labor", as it had the right to do under §§ 43–2153 and 41–3403, and for which it had been given an alternate verdict form. As a consequence, and in line with the interpretation consistently given § 43–2153 by the Supreme Court of Arkansas,[1] the death sentence was imposed. On appeal the conviction was affirmed. Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113 (1963).[2]

Four days before the execution date which was fixed following that unsuccessful appeal Maxwell filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Arkansas. Judge Young conducted a hearing on the federal constitutional issues raised by that petition. Briefs were filed. The court wrote a detailed opinion denying the relief requested, Maxwell v. Stephens, 229 F. Supp. 205 (E.D.Ark.1964), but then granted Maxwell's petition for a certificate of probable cause, as contemplated by 28 U.S.C. § 2253, and further stayed execution.

Except for an early period prior to the state trial when court appointed attorneys were in the case, Maxwell has been represented through all the state and federal proceedings by competent, although different, non-court-appointed counsel.

We note, as we have noted before in other cases of this type,[3] that Max-

1. Kelley v. State, 133 Ark. 261, 202 S.W. 49, 54 (1918); Bullen v. State, 156 Ark. 148, 245 S.W. 493, 494 (1922); Clark v. State, 169 Ark. 717, 276 S.W. 849, 853–854 (1925); Smith v. State, 205 Ark. 1075, 172 S.W.2d 248, 249 (1943); Turner v. State, 224 Ark. 505, 275 S.W.2d 24, 31 (1955); Stewart v. State, 233 Ark. 458, 345 S.W.2d 472, 475 (1961), cert. denied 368 U.S. 935, 82 S.Ct. 371, 7 L. Ed.2d 197.

2. No petition for certiorari was filed with the Supreme Court of the United States. This of course no longer constitutes a failure to exhaust available state remedies. Fay v. Noia, 372 U.S. 391, 435–438, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Curtis v. Boeger, 331 F.2d 675 (8 Cir. 1964).

3. Bailey v. Henslee, 287 F.2d 936, 939 (8 Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78; Henslee v.

well's guilt or innocence is not in issue before us. This is still another situation where, as the United States Supreme Court described the posture of an earlier Arkansas case, " * * * what we have to deal with is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved". Moore v. Dempsey, 261 U.S. 86, 87–88, 43 S.Ct. 265, 67 L.Ed. 543 (1923).

The circumstances and details of the crime are, as usual, sordid. They are set forth in the Arkansas opinion, pp. 114–116 of 370 S.W.2d, and need not be repeated here. It suffices only to say that the victim was a white woman, 35 years old, who lived with her helpless ninety-year-old father; that their home was entered in the early morning by the assailant's cutting or breaking a window screen; that in the ensuing struggle the victim bit her assailant and caused bleeding; and that she was assaulted and bruised, her father injured, and the lives of both threatened. Confessions taken from Maxwell were not employed at the trial. The defense presented no evidence. The jury was out several hours. No question is raised as to the sufficiency of the evidence.

On this habeas corpus appeal Maxwell presses three issues:[4] (1) he was denied due process of law and the equal protection of the laws, guaranteed by the Fourteenth Amendment, because he was sentenced under statutes which are dis-criminatorily enforced against Negroes; (2) he was denied due process and equal protection because the Garland County jury lists revealed race and were compiled from racially designated poll tax books; and (3) the taking of his coat while he was in custody, and references to it in testimony at the trial,[5] violated rights guaranteed to him under the Fourth, Fifth, and Fourteenth Amendments.

A. The statute's enforcement. The argument here is that § 41–3403, which prescribes the death penalty for rape, and § 43–2153, which, since its enactment as Acts 1915, No. 187, § 1, permits a jury in a death punishment case to render a verdict of life imprisonment, although perhaps constitutionally valid on their face, have been discriminatorily enforced against members of the Negro race and in favor of members of the white race. It is claimed that in practice "Negroes remain liable to the supreme penalty for the crime of rape, but whites, with very rare exceptions, suffer lesser punishments"; that "there is reason to believe that every person suffering the death penalty has been convicted of a crime against a white woman"; that "All but two of the men executed for rape since 1913 have been Negroes"; that Negro defendants are more likely to be sentenced to death and only white women are protected by the deterrence of the supreme penalty; that in Garland County (Hot Springs), Pulaski County (Little

---

Stewart, 311 F.2d 691, 692 (8 Cir. 1963), cert. denied 373 U.S. 902, 83 S.Ct. 1289, 10 L.Ed.2d 198.

4. Other issues urged in the district court, see pp. 208–209 and 211–212 of 229 F. Supp., but abandoned on this appeal, were the legality of Maxwell's arrest, the denial of a motion for change of venue, the validity of confessions taken from him, and the legality of a search of his person and of the clothing which he was wearing. This search produced or revealed a hair, a nylon thread, and blood and seminal stains which tended to identify him as the intruder-assailant.

5. No point is apparently made about the fact the coat itself (despite a contrary statement in the Maxwell brief) was not introduced in evidence. In view of this, we do not raise the point on our own accord. We assume that, for present purposes, questions of admissibility are as applicable to testimony concerning the coat as to the coat itself. McGinnis v. United States, 227 F.2d 598, 603 (1 Cir. 1955); Williams v. United States, 105 U.S.App.D.C. 41, 42–43, 263 F.2d 487, 488–489 (1959). See Silverthorne Lumber Co. v. United States, 251 U.S. 385, 391–392, 40 S.Ct. 182, 64 L.Ed. 319 (1920), and Wong Sun v. United States, 371 U.S. 471, 484, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

Rock), and Jefferson County (Pine Bluff), in the decade beginning January 1, 1954, only three charges were lodged against white men for the rape of Negro women; that one of these resulted in an acquittal and the other two in reduced charges; that in the same period seven Negroes were charged with raping white women; that of these, two were sentenced to death, three to life imprisonment, one dismissed, and one not apprehended; that "This history raises serious doubts about the fairness of Arkansas' system of criminal justice"; that the figures are not to be explained by the proportion of Negroes in the state's total population nor by any claim that the crime rate is higher among Negroes, for in the three counties about two-thirds of the rape charges were against white persons; that the proportion of Negroes who receive the death penalty "cries out for an explanation"; that race is the answer; and that the state should be required to come forward with a rational explanation.

It is further argued that there is no basis for assuming a Negro's victims have better character than the victims of whites; that differing sentences for Negroes and whites are consistent with Arkansas' system of justice; that responsibility for administration of penalties in rape cases lies with other officials besides juries; that "it is not what public officials say but what they do which must be determinative when discrimination is at issue"; that in Maxwell's state court proceedings "several occurrences underscored the presence of the racial factor", namely, the use of the term "nigger", the excuse or successful challenge of the nine Negroes who were called for jury service, and the prosecutor's reference to the race of the defendant and the victim three times during the state trial "under the guise of requesting the jurors to dismiss the fact from their minds"; that the state's laws on segregation and the history of the resistance to desegregation of schools in Little Rock are consistent with the contention that race is a factor in the disposition of rape cases and the imposition of the death penalty; that the court erred in restricting the defense proof of race figures to the three counties; and that, finally, the imposition of the death penalty for rape violates due process in that it is a cruel and unusual punishment.

This question of unconstitutionality in application was raised both in the Supreme Court of Arkansas and in the United States district court. Each tribunal decided the issue adversely to Maxwell. Pp. 117–118 of 370 S.W.2d; pp. 216–217 of 229 F.Supp.

■ ■ There can be no doubt that the equal protection clause of the Fourteenth Amendment and 42 U.S.C. § 1981,[6] which implements it, (and, it would appear, Art. 2, § 3, of the Arkansas Constitution) [7] operate to invalidate any state statute which would differentiate punishment solely on the basis of race. Virginia v. Rives, 100 U.S. 313, 318, 25 L.Ed. 667 (1879); Strauder v. State of West Virginia, 100 U.S. 303, 307, 25 L.Ed. 664 (1879); McLaughlin v. State of Florida, 379 U.S. 184, 192–194, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); see Skinner v. State of Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942). We recognize, too, that a statute's discriminatory administration or enforcement, dictated solely by considerations of race, runs afoul of the equal protection clause. Yick Wo v. Hopkins, 118 U.S. 356, 373–374, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); see Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497 (1944).

6. Section 1981. "All persons within the jurisdiction of the United States * * * shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

7. "The equality of all persons before the law is recognized, and shall ever remain inviolate; nor shall any citizen ever be deprived of any right, privilege or immunity, nor exempted from any burden or duty, on account of race, color or previous condition."

This court has not been insensitive to constitutional claims based upon race. See, for example, Aaron v. Cooper, 257 F.2d 33 (8 Cir. 1958), aff'd 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5; Bailey v. Henslee, 287 F.2d 936 (8 Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78; and Henslee v. Stewart, 311 F.2d 691 (8 Cir. 1963), cert. denied 373 U.S. 902, 83 S.Ct. 1289, 10 L.Ed.2d 198. "But purposeful discrimination may not be assumed or merely asserted. * * * It must be proven * * *", and the burden is on the one asserting discrimination. Swain v. State of Alabama, 380 U.S. 202, 205, 209, 85 S.Ct. 824, 827, 13 L.Ed.2d 759 (1965); Tarrance v. State of Florida, 188 U.S. 519, 520, 23 S.Ct. 402, 47 L.Ed. 572 (1903).

■ A meticulous review of the entire record in the United States district court and of the entire record in the state court convinces us that no federally unconstitutional application of the Arkansas rape statutes to this defendant has been demonstrated. We reach this result upon the following considerations:

1. The statistical argument is not at all persuasive. The evidence as to the state at large showed that, in the 50 years since 1913, 21 men have been executed for the crime of rape; that 19 of these were Negroes and two were white; [8] that the victims of the 19 convicted Negroes were white females; and that the victims of the two convicted whites were also white females. As to Garland County, for the decade beginning January 1, 1954, Maxwell's evidence was to the effect that seven whites were charged with rape (two of white women and the race of the other victims not disclosed), with four whites not prosecuted and three sentenced on reduced charges; that three Negroes were charged with rape, with one of a Negro woman not prosecuted and another of a Negro receiving a reduced sentence, and the third, the present defendant, receiving the death penalty. With respect to Pulaski County for the same decade, there were 11 whites (two twice) and 10 Negroes charged, with the race of the victim of two whites and one Negro not disclosed. Three whites received a life sentence. One white was acquitted of rape of a Negro woman. One received a sentence on a reduced charge, two were dismissed, two cases remained pending, one was not prosecuted, and the last was executed on a conviction for murder.[9] Of the Negroes, three with white victims and two with Negro victims received life. One case was dismissed, one was not arrested, two with Negro victims were sentenced on reduced charges, and one, Bailey, with a white victim, was sentenced to death. In Jefferson County eight Negroes were charged, with the cases against five dismissed, another dismissed when convicted on a murder charge, and two receiving sentences on reduced charges. Sixteen whites were charged. One was charged three times with respect to Negro victims and as to two of these charges received five years suspended on a guilty plea. Two others received three year sentences. One is pending, one was executed,[10] and the rest were dismissed. The race of four defendants was not disclosed; three of these cases were dismissed and one is pending.

The complaint as to the federal court's restricting the statistical inquiry to three counties was not preserved by objection or offer of proof and there is no claim here that material from the State's re-

8. Needham v. State, 215 Ark. 935, 224 S.W.2d 785 (1949); Fields v. State, 235 Ark. 986, 363 S.W.2d 905 (1963).

9. Leggett v. State, 227 Ark. 393, 299 S.W. 2d 59 (1957); Leggett v. State, 228 Ark. 977, 311 S.W.2d 521 (1958), cert. denied 357 U.S. 942, 78 S.Ct. 1393, 2 L.Ed.2d 1556; Leggett v. Henslee, 230 Ark. 183, 321 S.W.2d 764 (1959), cert. denied 361 U.S. 865, 80 S.Ct. 127, 4 L.Ed.2d 106; Leggett v. State, 231 Ark. 7, 328 S.W.2d 250 (1959); Leggett v. State, 231 Ark. 13, 328 S.W.2d 252 (1959); Leggett v. Kirby, 231 Ark. 576, 331 S.W.2d 267 (1960).

10. Fields v. State, supra, 235 Ark. 986, 363 S.W.2d 905 (1963).

maining counties would be any more significant than that of the three counties presented.

These facts do not seem to us to establish a pattern or something specific or useful here, or to provide anything other than a weak basis for suspicion on the part of the defense. The figures certainly do not prove current discrimination in Arkansas, for in the last fourteen years the men executed for rape have been two whites and two Negroes. The circumstances of each rape case have particular pertinency. We are given no information as to how many Negroes and how many whites, after investigation, were not charged. Note Hamm v. State, 214 Ark. 171, 214 S.W.2d 917 (1948), where a Negro convicted of rape of a white woman received a life sentence.

Turning to the three county statistics, we find no death sentence at all in Garland County in the 1954–1963 decade until Maxwell's case. We also find that of the two other Negroes charged, one was not prosecuted and the other was sentenced on a reduced charge. In Pulaski County we have about the same number of whites and Negroes charged, with only one death penalty, albeit in an interracial case, and one acquittal, also in an interracial case. But members of both races, three whites and five Negroes (three interracial), received life sentences. In Jefferson County we find few convictions for either race but one white man with a white victim was executed.

■ 2. The defense argument goes too far and would, if taken literally, make prosecution of a Negro impossible in Arkansas today because of the existence in the past of standards which are now questionable. This would effect discrimination in reverse. The fact that this court has concluded that certain Arkansas procedures did not meet constitutional standards as interpreted by the Supreme Court (see Bailey v. Henslee, supra, 287 F.2d 936, and Henslee v. Stewart, supra, 311 F.2d 691, but compare Moore v. Henslee, 276 F.2d 876 (8 Cir. 1960)) does not mean that this former defect must permeate all subsequent pro-

ceedings in the state so as to render them unconstitutional. We pointed this out, as to jury selection, in Bailey v. Henslee, supra, p. 943 of 287 F.2d, where we said, "Discriminatory selection in prior years does not nullify a present conviction if the selection of the jury for the current term is on a proper basis", and where we noted the Supreme Court's comment, in Brown v. Allen, 344 U.S. 443, 479, 73 S.Ct. 397, 418, 97 L.Ed. 469 (1953), that "Former errors cannot invalidate future trials".

3. The "nigger" references, while unfortunate, are only two in number and no objection was made to either. Both were at the state court hearing on defense motions when no jury was present. One was by the then superintendent of the state penitentiary. The other was the prosecutor's reference to "white persons or nigger persons". Throughout the balance of that hearing, throughout the entire state court trial, and throughout the federal habeas corpus proceeding, although race is necessarily mentioned many times, not one other instance of this kind appears.

■ 4. The other race references, complained of by the defense, are three in number. The first was in the prosecutor's opening statement to the jury: "I want to ask you first and tell you that it is your duty, and the Court will so instruct you, to put from your mind any thought of race. Ladies and Gentlemen, race has nothing to do with it * * *". The other two were of like import in his closing argument. We find no error in these three references. On their face they are as indicative of complete fairness as of unfairness. No point is raised as to tone of voice, attitude, or demeanor. The race of both the victim, who testified, and of Maxwell, who of course was present in court, was obvious. The comments, as we read them in context in the cold record, could well be deserving of commendation, rather than condemnation.

■ 5. The fact that in this particular case the nine Negroes who appeared for jury service were all excused for

cause by the court (three) or peremptorily challenged by the prosecution (six) and, as a consequence, the petit jury was all white, is not an unconstitutional result. Swain v. State of Alabama, supra, 380 U.S. 202, 209–222, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Hall v. United States, 83 U.S.App.D.C. 166, 169, 168 F.2d 161, 164, 4 A.L.R.2d 1193 (1948), cert. denied 334 U.S. 853, 68 S.Ct. 1509, 92 L.Ed. 1775; United States ex rel. Dukes v. Sain, 297 F.2d 799 (7 Cir. 1962), cert. denied 369 U.S. 868, 82 S.Ct. 1035, 8 L.Ed.2d 86. See Frazier v. United States, 335 U.S. 497, 507, 69 S.Ct. 201, 93 L.Ed. 187 (1948).

■ 6. We are aware of the comments of three Justices, at 375 U.S. 889–891, 84 S.Ct. 155, 11 L.Ed.2d 119, dissenting from the Supreme Court's denial of certiorari in Rudolph v. State of Alabama, 275 Ala. 115, 152 So.2d 662 (1963). The dissenters would have had the Court consider in that case whether the Eighth Amendment,[11] with its prohibition of "cruel and unusual punishments", and the Fourteenth "permit the imposition of the death penalty on a convicted rapist who has neither taken nor endangered human life". It is to be observed that the record before us reveals that the rapist of the victim here was evidently not one who failed to endanger human life. He struck and injured a helpless and aged man, he bruised the victim and he threatened to kill both. Despite whatever personal attitudes lower federal court judges as individuals might have toward capital punishment for rape, any judicial determination that a state's (in this case, Arkansas') long existent death-for-rape statute (it has been on the books since December 14, 1842) imposes punishment which is cruel and unusual, within the language of the Eighth Amendment and, by referenced inclusion, violative of due process within the meaning of the Fourteenth Amendment, must be for the Supreme Court in the first in-

stance and not for us. See Ralph v. Pepersack, 335 F.2d 128, 141 (4 Cir. 1964).

■ B. The selection of the petit jury. The defense argument here is that due process and equal protection have been denied Maxwell because the petit jury list was compiled from a racially designated poll tax book and because the jury list itself indicated race. This argument was not advanced in the state court proceedings.

In Arkansas petit jurors are selected from electors. Ark.Stat.1947, § 39–208. Electors are persons who currently have paid the State's poll tax. Ark.Const., Art. 3, § 1; Ark.Stat. § 3–104.2. The statutes require that the official list, bound as a book, of a county's poll tax payers, § 3–118, and the poll tax receipts, § 3–227(b), specify color.

In contrast to the situation in the district court, pp. 213–216 of 229 F. Supp., no issue is raised here as to any deficiency in the efforts or methods of the jury commissioners, as to underrepresentation of the Negro race in the Garland County jury lists, or as to any pattern of Negro repeaters on the juries.

In Bailey v. Henslee, supra, p. 940 of 287 F.2d, we outlined at footnote 5 the methods prescribed by the Arkansas Statutes for the selection of jury commissioners and of jurors and, at pp. 941–945, we set forth, with extensive citations, the applicable general principles relative to race in jury selection. We cited four United States Supreme Court cases of particular pertinence. Norris v. State of Alabama, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935); Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Avery v. State of Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953); and Eubanks v. State of Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958). In Henslee v. Stewart, supra, p. 694 of 311

11. The Arkansas Constitution, Art. 2, § 9, also reads:
    "Excessive bail shall not be required, nor shall excessive fines be imposed; nor shall cruel or unusual punishment be inflicted; nor witnesses be unreasonably detained."

F.2d, we again referred to the same principles and the same cases. To that list of four Supreme Court opinions one should now add Arnold v. North Carolina, 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964), where, with a substantial proportion of Negroes in the county and on the poll tax list but only one on a grand jury in 24 years, the Court held that a prima facie case of equal protection denial had been established, and Swain v. State of Alabama, supra, 380 U.S. 202, 205–209, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), where the Court held that there was no "forbidden token inclusion" and that a prima facie case of discrimination had not been made out when Negro representation on jury panels was existent though less than the percentage of Negro males in the county, when there was an average of six to seven Negroes on petit jury venires in criminal cases although no Negro had actually served on a petit jury since 1950, and when an identifiable group in a community is underrepresented by as much as ten percent. See, also, Coleman v. State of Alabama, 377 U.S. 129, 84 S.Ct. 1152, 12 L.Ed.2d 190 (1964).

In both Bailey and Stewart we concluded that the facts, in the aggregate, established a prima facie case of improper limitation of Negroes in the selection of a petit jury panel. Among the several factors which led to our conclusion in both Bailey and Stewart were the circumstances that the poll tax receipt carried, with other information, the color of the taxpayer and that the jury commissioners themselves affixed race identification marks to their lists. We mentioned, p. 947 of 287 F.2d, p. 695 of 311 F.2d, that this presented "a device for race identification with its possibility of abuse".

We do not reach the same conclusion here. Our reasons are the following: (1) There is no proof that the jury list was compiled from the poll tax list. Each jury commissioner specifically testified otherwise and asserted that a proposed list was first independently prepared and that the racially designated poll tax book was consulted only thereafter. It had to be consulted, of course, in order to ascertain that the persons tentatively selected were qualified electors. (2) Although the list of petit jurors formally transmitted by the jury commissioners to the clerk of court possessed, at the time of the habeas corpus hearing, a small handwritten "c" after eight of the 36 names thereon, exclusive of alternates, there was no positive evidence as to when those letters were affixed or by whom. The list had been compiled two months before the crime with which Maxwell was charged. Each commissioner denied making the identifying marks. (3) The clerk testified that he had no personal recollection whether, when he opened the list, it had any marks as to color; that he was not certain he had placed the marks on the list; that sometimes he did this for his own information and for newspapers; and that on most lists the jury commissioners did indicate race. Even the defense attorneys here had examined this particular list prior to the habeas corpus hearing. (4) None of the commissioners recalled the presence of race marks in the poll tax books. Each justified this conclusion on the ground that the marks were insignificant and unimpressive. (5) For what it is worth, one of the jury commissioners here was a Negro. The clerk testified that, with the exception of one or two terms, there has been a Negro jury commissioner for every term of court in Garland County in the last nine years.

In the light of these facts, we cannot conclude that the selection of this particular petit jury was unconstitutionally discriminatory. The use of race identification marks is, of course, under principles presently espoused, and as we noted in Bailey and again in Stewart, most disturbing. Whether the Arkansas statutory provisions requiring race identification on poll tax receipts and on the poll tax books are unconstitutional is a question not yet finally resolved. Hamm v. Virginia State Bd. of Elections, 230 F.Supp. 156, 157–158 (E.D.Va.1964),

summarily affd. sub nom. Tancil v. Woolls, 379 U.S. 19, 85 S.Ct. 157, 13 L.Ed.2d 91, appears to cast some doubt on their validity. Yet that opinion also states that race designations in certain records may serve a useful and lawful purpose. Until these Arkansas statutory requirements are nullified or repealed it is to be presumed that local officials must and will comply with them. The present action is not one to restrain such compliance. Persons desiring that result have the right to seek it. In the meantime, we cannot say that, because the poll tax receipts and books designate race, it necessarily follows that every jury list in Arkansas is automatically unconstitutional. So to conclude would ignore the important possibility of initial selection being made, as here, independent of the poll tax list. The Arkansas system may presently be imperfect but "an imperfect system is not equivalent to purposeful discrimination based on race". Swain v. State of Alabama, supra, p. 209 of 380 U.S., p. 830 of 85 S.Ct. We hold that the manner of selecting this particular petit jury list avoided any constitutional obstacle which might be inherent in the state statutes requiring race identification.

This makes it unnecessary to consider the argument (strenuously urged by Stephens and upheld by the District Court, pp. 212–213 of 229 F.Supp., as an alternative ground) that Maxwell waived any objection to the petit jury panel and did so within the permitted scope of Fay v. Noia, supra, 372 U.S. 391, 438–440, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963).

C. The coat. As has been noted, the controversial coat was not introduced in evidence at the state court trial. Witnesses, however, made references to it in their testimony.

Maxwell, of course, has standing to complain of these references. Jones v. United States, 362 U.S. 257, 265–267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

The facts here are important: The offense took place at approximately three o'clock in the morning of November 3, 1961. It was raining and wet.

The victim was promptly taken by the police to a hospital. At the hospital she described her assailant to Captain Crain of the Hot Springs Police Department and to Officer O. D. Pettus, a Negro. She stated that the man had told her he was Willie C. Washington. Two persons with that name, senior and junior, were brought before her but she identified neither. She described her attacker in greater detail. Pettus thereupon suggested that it might have been Maxwell. Officer Childress, who was on car patrol duty and in uniform at the time, was directed by radio to pick up Maxwell. He went to the Maxwell home. The defendant's mother, then age 38, answered his knock. He told her he wanted to talk to William. She let him enter, checked to see if her son was in, and led Childress to the bedroom occupied by Maxwell and two younger sons. Childress told Maxwell he wanted to talk to him down town and asked him to dress. Childress testified that Maxwell went to the closet for clothes that were hanging there in a wrapper, and that he asked him "to put on these other clothes here that he had on". The latter were wet. Maxwell testified that he was told to put on the clothes he had on that night, that he went to the closet to get these, that he was then told to put on the clothes folded on the chair, that he was going to take those clothes to the cleaners, and that they were not his.

Maxwell was taken to the hospital and before the victim. She at first did not identify him as her attacker but witnesses described her as visibly disturbed and shaking when he stood before her. She later said she had recognized him but feared for her life if she identified him. Maxwell was taken from the hospital to the police station.

Both sides admit that the exact times and place of Maxwell's arrest "is not entirely clear from the record". It might have been at the home at about four a. m. or shortly thereafter at the hospital.

Captain Crain, with Officer Timms, went to the Maxwell home about five

a. m. to get, as he testified at the habeas corpus hearing, "some more clothes that we thought might help us in our investigation of this case" or, as he testified at the trial, "I was looking for a particular object * * * I wanted what he was wearing that night". They had no search warrant. Mrs. Maxwell permitted them to enter. They were in uniform. The testimony is in conflict as to whether Mrs. Maxwell was then informed of any charge against her son; Crain said he so advised her but she stated, "He didn't say nothing about no rape case". (The district court found she had been so advised). She directed the officers to the clothes closet. The blue coat in question was obtained from that closet. It was eventually sent to the FBI laboratory. At the trial there was expert testimony that fibers in the coat matched others found on the victim's pajamas and on part of a nylon stocking picked up near the scene of the crime, and that fibers in the pajamas matched those found on the coat.

Mrs. Maxwell was understandably upset at the times the officers called at her home. In the margin we quote her testimony as to both the first call [12] and the second call.[13] Maxwell's father worked at night and was not home when the officers called.

At the habeas corpus hearing Maxwell admitted that he had been adjudged guilty of two counts of petit larceny in 1958 and of federal post office charges in the same year.

We thus have a situation where the Maxwell home was twice visited by officers within two hours after the very crime was committed, where the second visit was within an hour of the first, where the officers were in uniform, where they were permitted access to the home by the mother, where on the second visit she pointed out the closet where the coat was, and where the accused, with his brothers, was still living with his parents in that home.

The district court held, pp. 209–211 of 229 F.Supp., that the taking of the coat violated no Fourth Amendment rights of Maxwell because his mother freely gave her consent and had the authority so to consent and because, upon all the circumstances, any search and seizure here was reasonable.

■ The parties are agreed, of course, that the Fourth Amendment's restraints against unreasonable searches and seizures are now applicable to the states under the due process clause of the Fourteenth Amendment and are to be measured by standards which govern federal cases, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Ker v. State of California, 374 U.S. 23, 33, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Aguilar v. State of Texas, 378 U.S. 108, 110, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), and that the Fifth Amendment's guaranty against self-incrimination, through the Fourteenth, is also applicable to the states and upon federal

12. "* * * it was late and I was asleep and someone knocked on the door and I woke up and I asked who was it and he said the policeman and I went to the door to let him in. He asked me did I have a son here by the name of William and I told him yes and he just come on in, he didn't have a search warrant or anything and I let him. I didn't know any better myself but I—I didn't know that he—you know, everything was all right, my children were at home and all and I just let him in."

13. "I opened the door and I was afraid to not let them in because—you know—when they said they were police officers—well, you just—I've just always—I just let the police officers in because I just feel like he is for peace and all, and I just —I don't know, I didn't know anything —I never been in anything like this and I just let them in and I still didn't think anything, didn't any of those officer have any search warrant or anything, didn't show me anything like that."

standards.[14] Malloy v. Hogan, 378 U.S. 1, 8, 11, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

The parties are not in agreement, however, as to whether what was done here was incident to a lawful arrest, see Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), or, if not, as to whether it was justified because of emergency or exceptional circumstances. We pass these issues and move on to the questions whether there was a consent by Mrs. Maxwell and, if so, whether her consent was a curative factor.

■ Although a consent freely and intelligently given by the proper person may operate to eliminate any question otherwise existing as to the propriety of a search, Honig v. United States, 208 F.2d 916, 919 (8 Cir. 1953); Burge v. United States, 332 F.2d 171, 173 (8 Cir. 1964), cert. denied 379 U.S. 883, 85 S.Ct. 155, 13 L.Ed.2d 89; Burnside v. Nebraska, 346 F.2d 88 (8 Cir. 1965), the defense argues that there is a presumption that a consent is coerced unless proved otherwise by the government and that the facts here—the early morning calls at the Maxwell home, the presence of men clothed with the uniform of authority, the confrontation of a Negro mother by white police, and her obvious concern and confusion—"militate against finding voluntary consent".

■ We recognize that it has been said that the government has the burden to establish the legal sufficiency of a consent. Judd v. United States, 89 U.S.App.D.C. 64, 66, 190 F.2d 649, 651 (D.C.Cir. 1951); United States v. Page, 302 F.2d 81, 83–84 (9 Cir. 1962). Nevertheless, the existence and voluntariness of a consent is a question of fact. United States v. Page, supra, p. 83 of 302 F.2d. And Judge Young specifically found that there was a consent here and that it was voluntary. We cannot say that his finding was either erroneous or unsupported by substantial evidence. United States v. Page, supra, p. 85 of 302 F.2d; Davis v. United States, 328 U.S. 582, 593, 66 S.Ct. 1256, 90 L.Ed. 1453 (1946); United States v. Ziemer, 291 F.2d 100, 102 (7 Cir. 1961), cert. denied 368 U.S. 877, 82 S.Ct. 120, 7 L.Ed.2d 78; McDonald v. United States, 307 F.2d 272, 275 (10 Cir. 1962). The record clearly discloses no concealment of identity, no discourtesy, no abuse or threat, and no ruse or force exerted by the officers. It contains testimony that Mrs. Maxwell showed and directed them to the closet where her son's clothes were. On cross-examination she herself conceded that she permitted the officers to enter and to obtain the coat. She fully cooperated. She and her husband were both present throughout the state court trial, sat with their son at the counsel table, and heard, with no indication of opposition, the testimony of the officers as to how the coat was obtained with her permission. All this adequately supports the court's finding of voluntary consent. Roberts v. United States, 332 F.2d 892, 897 (8 Cir. 1964). The factual situation is different than that of Pekar v. United States, 315 F.2d 319, 325 (5 Cir. 1963), urged by Maxwell here, or the implied coercion referred to in Amos v. United States, 255 U.S. 313, 317, 41 S.Ct. 266, 65 L.Ed. 654 (1921).

■ What, then, is the effect of this voluntary consent on the part of

---

14. The Fifth-Fourteenth Amendment argument as to self-incrimination, although possibly embraced in the language of the first amendment to the petition for writ of habeas corpus (where it was alleged that the police searched Maxwell's room "and obtained clothing belonging to petitioner without a search warrant, without the consent of petitioner and without the consent of petitioner's parents"), was apparently not pressed before the district court and is really asserted for the first time only on this appeal. Because of this we could choose to ignore it here. Sutton v. Settle, 302 F.2d 286, 288 (8 Cir. 1962), cert. denied 372 U.S. 930, 83 S.Ct. 876, 9 L.Ed.2d 734; Huntington v. State of Michigan, 334 F.2d 615, 616 (6 Cir. 1964); Trujillo v. Tinsley, 333 F.2d 185 (10 Cir. 1964). But this is a capital case and, without our doing so being regarded as a precedent, we consider this point on the merits.

Maxwell's mother? We recognize, of course, that constitutional rights are not to depend upon "subtle distinctions, developed and refined by the common law in evolving the body of private property law". Jones v. United States, supra, 362 U.S. 257, 266, 80 S.Ct. 725, 733 (1960). But this is not a case of property right distinctions. The defense concedes that Mrs. Maxwell possessed a proprietary interest in the house; that Maxwell himself only shared a room there with his two younger brothers; and that no landlord-tenant relationship existed between Maxwell and his parents. Mrs. Maxwell had control of the premises, undiminished by any kind of a less-than-fee interest possessed by Maxwell. This fact stands in contrast to the hotel or rental situations.[15] See Stoner v. State of California, 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964); United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59 (1951); Lustig v. United States, 338 U.S. 74, 69 S.Ct. 1372, 93 L.Ed. 1819 (1949); Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961); McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948); Klee v. United States, 53 F.2d 58 (9 Cir. 1931). The situation strikes us as being no different, factually, than if Mrs. Maxwell herself had brought the coat, it being properly in her possession, to the authorities. They came to the home, it is true, but they obtained the coat by freely allowed access to the house, by freely given directions as to its location, and by freely permitted acquisition of it by the officers and departure with it in their hands. Roberts v. United States, supra, 332 F.2d 892, 896–897 (8 Cir. 1964); Burge v. United States, 342 F.2d 408, 413–414 (9 Cir. 1965); Rees v. Peyton, 341 F.2d 859, 861–863 (4 Cir. 1965); United States v. Guido, 251 F.2d 1, 3–4 (7 Cir. 1958), cert. denied 356

U.S. 950, 78 S.Ct. 915, 2 L.Ed.2d 843; Woodard v. United States, 102 U.S.App. D.C. 393, 254 F.2d 312 (1958), cert. denied 357 U.S. 930, 78 S.Ct. 1375, 2 L.Ed. 2d 1372; Fredricksen v. United States, 105 U.S.App.D.C. 262, 263, 266 F.2d 463, 464 (1959); Morales v. United States, 344 F.2d 846 (9 Cir. 1965); United States ex rel. McKenna v. Myers, 232 F.Supp. 65, 66 (E.D.Pa.1964). See United States ex rel. Puntari v. Maroney, 220 F.Supp. 801, 805–806 (W.D.Pa. 1963); Gray v. Commonwealth, 198 Ky. 610, 249 S.W. 769 (1923); Irvin v. State, Fla., 66 So.2d 288, 293 (1953), cert. denied 346 U.S. 927, 74 S.Ct. 316, 98 L.Ed. 419.

But the defense argues that this coat was Maxwell's personal effect and clothing; that it could not be picked up or acquired in any manner, even with a valid search warrant, without his consent; and that it was evidentiary material not the proper subject of a search. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921) and Holzhey v. United States, 223 F.2d 823 (5 Cir. 1955) are particularly cited.

Whatever force might otherwise lie in the facts that the coat was clothing personal to Maxwell (and thus presumably an "effect" within the meaning of the Fourth Amendment), that it was not contraband or an article the possession of which is illegal, or an instrumentality or fruit of the crime, or capable of possible use to effect his escape, see Harris v. United States, 331 U.S. 145, 154, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947); United States v. Lefkowitz, 285 U.S. 452, 463–466, 52 S.Ct. 420, 76 L.Ed. 877 (1932); Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 70 L.Ed. 145 (1925); Honig v. United States, supra, pp. 919–920 of 208 F.2d, this argument overlooks the consent to the officers' acquisition of the coat by a person having the pro-

---

15. But even in these situations abandonment (not present here) while the rental term is not yet expired overcomes any obstacle presented by a rental relationship. Abel v. United States, 362 U.S. 217, 240–241, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960); Feguer v. United States, 302 F.2d 214, 248–249 (8 Cir. 1962), cert. denied 371 U.S. 872, 83 S.Ct. 123, 9 L.Ed.2d 110; Roberts v. United States, 332 F.2d 892, 898 (8 Cir. 1964).

prietary interest in the premises where it was. If there was a search here at all, it was not a general search and certainly it was not a search violative of a locked container or the like. Roberts v. United States, supra, p. 898 of 332 F.2d. Compare United States v. Blok, 88 U.S.App.D.C. 326, 328, 188 F.2d 1019, 1021 (1951); Holzhey v. United States, supra, p. 826 of 223 F.2d. It was an item which freely came into the hands of the authorities by one who had the right to make it available to them. See Haas v. United States, 344 F.2d 56, 57–60 (8 Cir. 1965), where this court upheld the seizure, in a search pursuant to a lawful arrest, of a defendant's grey suit which fit the description of clothing worn by a bandit, and Irvin v. State, supra, p. 293 of 66 So.2d. Compare Williams v. United States, supra, 263 F.2d 487.

The situation therefore appears to us to be one not involving any unreasonable search or seizure within the prohibition of the Fourth, Fifth, and Fourteenth Amendments. Reasonableness, after all, is the applicable standard. United States v. Rabinowitz, 339 U.S. 56, 63, 70 S.Ct. 430, 94 L.Ed. 653 (1950); Sartain v. United States, 303 F.2d 859, 862–863 (9 Cir. 1962), cert. denied 371 U.S. 894, 83 S.Ct. 194, 9 L.Ed.2d 127.

██ Neither are we impressed with any suggestion that the testimonial references to the coat were in any way a further violation of Maxwell's right not to be compelled physically to be a witness against himself, within the meaning of the Fifth and Fourteenth Amendments. The description of the coat and what was found on it was objective evidence from the mouths of witnesses who saw or who investigated. The coat is in no different category than the contours of Maxwell's face, the color of his hair, the description and the nature and condition of the clothes he wore, and his very size and color. Holt v. United States, 218 U.S. 245, 252–253, 31 S.Ct. 2, 54 L.Ed. 1021 (1910); Caldwell v. United States, 338 F.2d 385, 389 (8 Cir. 1964).

The district court's denial of the petition for habeas corpus is therefore affirmed. Where life is concerned a conclusion of this kind may involve a personal reluctance for judges. We deal, however, with statutory provisions which are not our province, at least not yet (see Rudolph v. State of Alabama, supra, 375 U.S. 889, 84 S.Ct. 155, 11 L.Ed.2d 119), to change. Maxwell's life therefore must depend upon different views entertained by the Supreme Court of the United States or upon the exercise of executive clemency.

RIDGE, Circuit Judge (dissenting):

I agree with the disposition made in the majority opinion of appellant's assignments of error 1 and 2, as raised in this appeal.

I cannot agree with the ruling and disposition made in respect to assignment of error 3, i. e. the search and seizure issue * * * the taking of appellant's "coat" from his place of abode by police officers under the factual circumstances related in the majority opinion.

As I view the facts in the majority opinion and those appearing in Maxwell v. State, 236 Ark. 694, 370 S.W.2d 113 (1963); and Maxwell v. Stephens, 229 F.Supp. 205 (E.D.Ark.1964), I think it is readily apparent that the search of appellant's place of abode and seizure of his "blue coat" were made under factual circumstances which reveal the same to be in violation of his Fourth Amendment rights made obligatory on the States by the Fourteenth Amendment to enforce.

I find fortification for that conclusion from the opinion and decision of the Court of Appeals of Kentucky, as made in Elmore v. Commonwealth, 282 Ky. 443, 138 S.W.2d 956 (1940), where that Court considered a factual situation in a rape case, which are on all fours with those appearing in the case at bar and ruled the seizure there made to be unlawful under federal constitutional standards.

In adjudging the validity of the search and seizure issue here, the starting point begins with appellant's arrest. Hence I

consider the constitutionality thereof must be measured by a consideration of the following facts:

When Police Officer Childress first went to appellant's home he did so for the purpose of taking appellant into custody. At that time he told appellant, "he (Childress) wanted to talk to him downtown, and asked him to dress * * *" and "to put on (the) clothes he had on" previously that night, "which were wet." Under compulsion of Childress' command, appellant dressed. I find no reasonable ground for hesitancy in determining Maxwell was then placed under arrest. cf. State v. King, 84 N.J.Super. 297, 201 A.2d 758. Concededly, no search was then made by Officer Childress to seize appellant's coat incident to his arrest.

That appellant did not voluntarily leave his home in company with Officer Childress is manifest, cf. Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649 (1951).

One or two hours thereafter, Capt. Crain and Officer Timms went to the Maxwell home, without a search warrant, and took possession of appellant's "blue coat" under circumstances as related in the majority opinion. The conversation those two police officers then had with appellant's mother does not raise a question of credibility. The only issue presented thereby is whether "consent" as claimed by the State was freely given to those officers to search the Maxwell home, and whether appellant's mother had power of possession to release appellant's personal belongings to the custody of such officers.

I do not consider the conversation appellant's mother had with Capt. Crain and Officer Timms to have any probative value in making a determination of the validity of the search and seizure made by those officers. Mere acquiescence in the apparent authority of a police officer is not usually considered consent. cf. Dukes v. United States, 275 F. 142 (4 Cir., 1921); United States v. Marquette, 271 F. 120 (N.D.Cal.1920). What was then said by appellant's mother "was but showing her respect for and obedience to the law and she was not consenting to the search regardless (of lack of a) search warrant." Stroud v. Commonwealth, 295 Ky. 694, 175 S.W.2d 368, 370, citing Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921); and Elmore v. Commonwealth, supra. As the majority opinion notes, the validity of arrest and search and seizure here must be determined by reasonableness in light of the particular circumstances revealed. I consider the factual circumstances in the case at bar reveal "implied coercion."

Admittedly, the coat that was seized was the personal property of appellant. Being under arrest at the time he was taken from the place of his abode, where the coat was then situate, the only reasonable inference is that he did not voluntarily place possession of his coat in his mother or anyone else. No one can waive his constitutional right to assert his right of possession thereof. The search here made was not incident to his arrest. To be legal, the seizure of appellant's coat could only have been validly made without a search warrant at the time appellant was arrested by Officer Childress. His other clothing was so seized.

Respondent's argument that this search and seizure was lawful because of possible destruction of evidence, and "inability to secure issuance of a search warrant," is hollow, indeed. Appellant was then under arrest. There is no evidence that his mother had any knowledge that his coat might be material to any offense for which her son was arrested. The only possible inference I can make is that she first gleaned knowledge of the cause of his arrest from Capt. Crain or Officer Timms during the time the illegal search and seizure here considered was made. It is not contended that Childress told her why appellant was being taken "downtown". cf. Foster v. United States (8 Cir., 1960), 281 F.2d 310.

I would reverse the judgment below.